OLYMPIC AIRWAYS *v.* HUSAIN, INDIVIDUALLY, AND AS
PERSONAL REPRESENTATIVE OF THE ESTATE OF
HANSON, DECEASED, ET AL.

No. 02–1348.   Argued November 12, 2003—Decided February 24, 2004

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR, J., joined as to Parts I and II, *post*, p. 658. BREYER, J., took no part in the consideration or decision of the case.

*Andrew J. Harakas* argued the cause for petitioner. With him on the briefs was *Diane Westwood Wilson.*

*H. Bartow Farr III* argued the cause for respondents. With him on the brief were *Richard G. Taranto, Gerald C. Sterns,* and *Susie Injijian.*

*Barbara McDowell* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Olson, Assistant Attorney General*

Keisler, *Deputy Solicitor General* Kneedler, Lowell V. Sturgill, Jr., William H. Taft IV, and *Kirk K. Van Tine.**

JUSTICE THOMAS delivered the opinion of the Court.

Article 17 of the Warsaw Convention (Convention)[1] imposes liability on an air carrier for a passenger's death or bodily injury caused by an "accident" that occurred in connection with an international flight. In *Air France* v. *Saks*, 470 U. S. 392 (1985), the Court explained that the term "accident" in the Convention refers to an "unexpected or unusual event or happening that is external to the passenger," and not to "the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Id.*, at 405, 406. The issue we must decide is whether the "accident" condition precedent to air carrier liability under Article 17 is satisfied when the carrier's unusual and unexpected refusal to assist a passenger is a link in a chain of causation resulting in a passenger's pre-existing medical condition being aggravated by exposure to a normal condition in the aircraft cabin. We conclude that it is.

I

The following facts are taken from the District Court's findings, which, being unchallenged by either party, we accept as true. In December 1997, Dr. Abid Hanson and his wife, Rubina Husain (hereinafter respondent), traveled with their children and another family from San Francisco to Athens and Cairo for a family vacation. During a stopover in New York, Dr. Hanson learned for the first time that petitioner allowed its passengers to smoke on international

---

*Warren L. Dean, Jr.*, filed a brief for the Air Transport Association of America, Inc., as *amicus curiae* urging reversal.

[1] Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T. S. No. 876 (1934), note following 49 U. S. C. § 40105.

flights. Because Dr. Hanson had suffered from asthma and was sensitive to secondhand smoke, respondent requested and obtained seats away from the smoking section. Dr. Hanson experienced no problems on the flights to Cairo.

For the return flights, Dr. Hanson and respondent arrived early at the Cairo airport in order to request nonsmoking seats. Respondent showed the check-in agent a physician's letter explaining that Dr. Hanson "has [a] history of recurrent anaphylactic reactions," App. 81, and asked the agent to ensure that their seats were in the nonsmoking section. The flight to Athens was uneventful.

After boarding the plane for the flight to San Francisco, Dr. Hanson and respondent discovered that their seats were located only three rows in front of the economy-class smoking section. Respondent advised Maria Leptourgou, a flight attendant for petitioner, that Dr. Hanson could not sit in a smoking area, and said, "'You have to move him.'" 116 F. Supp. 2d 1121, 1125 (ND Cal. 2000). The flight attendant told her to "'have a seat.'" *Ibid.* After all the passengers had boarded but prior to takeoff, respondent again asked Ms. Leptourgou to move Dr. Hanson, explaining that he was "'allergic to smoke.'" *Ibid.* Ms. Leptourgou replied that she could not reseat Dr. Hanson because the plane was "'totally full'" and she was "too busy" to help. *Ibid.*

Shortly after takeoff, passengers in the smoking section began to smoke, and Dr. Hanson was soon surrounded by ambient cigarette smoke. Respondent spoke with Ms. Leptourgou a third time, stating, "'You have to move my husband from here.'" *Id.*, at 1126. Ms. Leptourgou again refused, stating that the plane was full. Ms. Leptourgou told respondent that Dr. Hanson could switch seats with another passenger, but that respondent would have to ask other passengers herself, without the flight crew's assistance. Respondent told Ms. Leptourgou that Dr. Hanson had to move even if the only available seat was in the cockpit or in

business class, but Ms. Leptourgou refused to provide any assistance.[2]

About two hours into the flight, the smoking noticeably increased in the rows behind Dr. Hanson. Dr. Hanson asked respondent for a new inhaler because the one he had been using was empty. Dr. Hanson then moved toward the front of the plane to get some fresher air. While he was leaning against a chair near the galley area, Dr. Hanson gestured to respondent to get his emergency kit. Respondent returned with it and gave him a shot of epinephrine. She then awoke Dr. Umesh Sabharwal, an allergist, with whom Dr. Hanson and respondent had been traveling. Dr. Sabharwal gave Dr. Hanson another shot of epinephrine and began to administer CPR and oxygen. Dr. Hanson died shortly thereafter.[3] *Id.*, at 1128.

Respondents filed a wrongful-death suit in California state court. Petitioner removed the case to federal court, and the District Court found petitioner liable for Dr. Hanson's death. The District Court held that Ms. Leptourgou's refusal to reseat Dr. Hanson constituted an "accident" within the meaning of Article 17. Applying *Saks'* definition of that term, the court reasoned that the flight attendant's conduct was external to Dr. Hanson and, because it was in "blatant disregard of industry standards and airline policies," was not expected or usual. 116 F. Supp. 2d, at 1134.

The Ninth Circuit affirmed. Applying *Saks'* definition of "accident," the Ninth Circuit agreed that the flight attendant's refusal to reseat Dr. Hanson "was clearly external to

---

[2] Dr. Hanson and respondent did not know at the time that, despite Ms. Leptourgou's representations, the flight was actually not full. There were 11 unoccupied passenger seats, most of which were in economy class, and 28 "non-revenue passengers," 15 of whom were seated in economy class rows farther away from the smoking section than Dr. Hanson's seat. 116 F. Supp. 2d, at 1126.

[3] For religious reasons, no autopsy was performed to determine the cause of death.

Dr. Hanson, and it was unexpected and unusual in light of industry standards, Olympic policy, and the simple nature of Dr. Hanson's requested accommodation." 316 F. 3d 829, 837 (2002). We granted certiorari, 538 U. S. 1056 (2003), and now affirm.

## II

## A

We begin with the language of Article 17 of the Convention, which provides:[4]

"The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018.[5]

In *Saks*, the Court recognized that the text of the Convention does not define the term "accident" and that the context in which it is used is not "illuminating." 470 U. S., at 399.

---

[4] The Warsaw Convention's governing text is in French. We cite to the official English translation of the Convention, which was before the Senate when it consented to ratification of the Convention in 1934. See 49 Stat. 3014; *Air France v. Saks*, 470 U. S. 392, 397 (1985).

[5] After a plaintiff has established a prima facie case of liability under Article 17 by showing that the injury was caused by an "accident," the air carrier has the opportunity to prove under Article 20 that it took "all necessary measures to avoid the damage or that it was impossible for [the airline] to take such measures." 49 Stat. 3019. Thus, Article 17 creates a presumption of air carrier liability and shifts the burden to the air carrier to prove lack of negligence under Article 20. Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv. L. Rev. 497, 521 (1967). Article 22(1) caps the amount recoverable under Article 17 in the event of death or bodily injury, and Article 25(1) removes the cap if the damage is caused by the "wilful misconduct" of the airline or its agent, acting within the scope of his employment. See 49 Stat. 3019, 3020. Additionally, Article 21 enables an air carrier to avoid or reduce its liability if it can prove the passenger's comparative negligence. See *id.*, at 3019.

The Court nevertheless discerned the meaning of the term "accident" from the Convention's text, structure, and history as well as from the subsequent conduct of the parties to the Convention.

Neither party here contests *Saks*' definition of the term "accident" under Article 17 of the Convention. Rather, the parties differ as to which *event* should be the focus of the "accident" inquiry. The Court's reasoning in *Saks* sheds light on whether the flight attendant's refusal to assist a passenger in a medical crisis is the proper focus of the "accident" inquiry.

In *Saks*, the Court addressed whether a passenger's "'loss of hearing proximately caused by normal operation of the aircraft's pressurization system'" was an "'accident.'" *Id.*, at 395. The Court concluded that it was not, because the injury was her "own internal reaction" to the normal pressurization of the aircraft's cabin. *Id.*, at 406. The Court noted two textual clues to the meaning of the term "accident." First, the Convention distinguishes between liability under Article 17 for death or injuries to passengers caused by an "accident" and liability under Article 18 for destruction or loss of baggage caused by an "occurrence." *Id.*, at 398. The difference in these provisions implies that the meaning of the term "accident" is different from that of "occurrence." *Ibid.* Second, the Court found significant the fact that Article 17 focuses on the "accident which caused" the passenger's injury and not an accident that is the passenger's injury. *Ibid.* The Court explained that it is the cause of the injury—rather than the occurrence of the injury—that must satisfy the definition of "accident." *Id.*, at 399. And recognizing the Court's responsibility to read the treaty in a manner "consistent with the shared expectations of the contracting parties," *ibid.*, the Court also looked to the French legal meaning of the term "accident," which when used to describe the cause of an injury, is usually defined as a "fortuitous, unexpected, unusual, or unintended event," *id.*, at 400.

Accordingly, the Court held in *Saks* that an "accident" under Article 17 is "an unexpected or unusual event or happening that is external to the passenger," and not "the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Id.*, at 405, 406.[6] The Court emphasized that the definition of "accident" "should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.*, at 405. The Court further contemplated that intentional conduct could fall within the "accident" definition under Article 17,[7] an interpretation that comports with another provision of the Convention.[8] As such, *Saks* correctly characterized the

---

[6] The term "accident" has at least two plausible yet distinct definitions. On the one hand, as noted in *Saks*, "accident" may be defined as an unintended event. See Webster's New World College Dictionary 8 (4th ed. 1999) ("a happening that is not . . . intended"); see also American Heritage Dictionary 10 (4th ed. 2000) ("[l]ack of intention; chance"); *Saks*, 470 U. S., at 400. On the other hand, as noted in *Saks*, the term "accident" may be defined as an event that is "unusual" or "unexpected," whether the result of intentional action or not. *Ibid.* See Black's Law Dictionary 15 (6th ed. 1990) ("an unusual, fortuitous, unexpected, unforeseen, or unlooked for event, happening or occurrence" and "if happening wholly or partly through human agency, an event which under the circumstances is unusual and unexpected by the person to whom it happens"); see also American Heritage Dictionary, *supra*, at 10 ("[a]n unexpected and undesirable event," "[a]n unforeseen incident"). Although either definition of "accident" is at first glance plausible, neither party contests the definition adopted by the Court in *Saks*, which after careful examination discerned the meaning of "accident" under Article 17 of the Convention as an "unexpected or unusual event or happening that is external to the passenger." 470 U. S., at 405.

[7] The Court cited approvingly several lower court opinions where intentional acts by third parties—namely, torts committed by terrorists—were recognized as "accidents" under a "broa[d]" interpretation of Article 17. *Ibid.* (citing lower court cases).

[8] Specifically, Article 25 removes the cap on air carrier liability when the injury is caused by the air carrier's "wilful misconduct." 49 Stat. 3020. Because there can be no liability for passenger death or bodily injury under the Convention in the absence of an Article 17 "accident," such

term "accident" as encompassing more than unintentional conduct.

The Court focused its analysis on determining "what causes can be considered accidents," and observed that Article 17 "embraces causes of injuries" that are "unexpected or unusual." *Id.*, at 404, 405. The Court did not suggest that only one event could constitute the "accident," recognizing that "[a]ny injury is the product of a chain of causes." *Id.*, at 406. Thus, for purposes of the "accident" inquiry, the Court stated that a plaintiff need only be able to prove that "some link in the chain was an unusual or unexpected event external to the passenger." *Ibid.*

## B

Petitioner argues that the "accident" inquiry should focus on the "injury producing event," Reply Brief for Petitioner 4, which, according to petitioner, was the presence of ambient cigarette smoke in the aircraft's cabin. Because petitioner's policies permitted smoking on international flights, petitioner contends that Dr. Hanson's death resulted from his own internal reaction—namely, an asthma attack—to the normal operation of the aircraft. Petitioner also argues that the flight attendant's failure to move Dr. Hanson was inaction, whereas Article 17 requires an action that causes the injury.

We disagree. As an initial matter, we note that petitioner did not challenge in the Court of Appeals the District Court's finding that the flight attendant's conduct in three times refusing to move Dr. Hanson was unusual or unexpected in light of the relevant industry standard or petitioner's own company policy. 116 F. Supp. 2d, at 1133. Petitioner instead argued that the flight attendant's conduct was irrelevant for purposes of the "accident" inquiry and that the only relevant event was the presence of the ambient cigarette

"wilful misconduct" is best read to be included within the realm of conduct that may constitute an "accident" under Article 17.

smoke in the aircraft's cabin. Consequently, we need not dispositively determine whether the flight attendant's conduct qualified as "unusual or unexpected" under *Saks*, but may assume that it was for purposes of this opinion.

Petitioner's focus on the ambient cigarette smoke as the injury producing event is misplaced. We do not doubt that the presence of ambient cigarette smoke in the aircraft's cabin during an international flight might have been "normal" at the time of the flight in question. But petitioner's "injury producing event" inquiry—which looks to "the precise factual 'event' that caused the injury"—neglects the reality that there are often multiple interrelated factual events that combine to cause any given injury. Brief for Petitioner 14. In *Saks*, the Court recognized that any one of these factual events or happenings may be a link in the chain of causes and—so long as it is unusual or unexpected—could constitute an "accident" under Article 17. 470 U. S., at 406. Indeed, the very fact that multiple events will necessarily combine and interrelate to cause any particular injury makes it difficult to define, in any coherent or non-question-begging way, any single event as *the* "injury producing event."

Petitioner's only claim to the contrary here is to say: "Looking to the purely factual description of relevant events, the aggravating event was Dr. Hanson remaining in his assigned non-smoking seat and being exposed to ambient smoke, which allegedly aggravated his pre-existing asthmatic condition leading to his death," Brief for Petitioner 24, and that the "injury producing event" was "not the flight attendant's failure to act or violation of industry standards," Reply Brief for Petitioner 9–10. Petitioner ignores the fact that the flight attendant's refusal on three separate occasions to move Dr. Hanson was also a "factual 'event,'" Brief for Petitioner 14, that the District Court correctly found to be a "'link in the chain'" of causes that led to Dr. Hanson's death, 116 F. Supp. 2d, at 1135. Petitioner's statement that the flight attendant's failure to reseat Dr. Hanson was not the

"injury producing event" is nothing more than a bald assertion, unsupported by any law or argument.

An example illustrates why petitioner's emphasis on the ambient cigarette smoke as the "injury producing event" is misplaced. Suppose that petitioner mistakenly assigns respondent and her husband to seats in the middle of the smoking section, and that respondent and her husband do not notice that they are in the smoking section until after the flight has departed. Suppose further that, as here, the flight attendant refused to assist respondent and her husband despite repeated requests to move. In this hypothetical case, it would appear that, "[l]ooking to the purely factual description of relevant events, the aggravating event was [the passenger] remaining in his assigned . . . seat and being exposed to ambient smoke, which allegedly aggravated his pre-existing asthmatic condition leading to his death." Brief for Petitioner 24. To argue otherwise, petitioner would have to suggest that the misassignment to the smoking section was *the* "injury producing event," but this would simply beg the question. The fact is, the exposure to smoke, the misassignment to the smoking section, and the refusal to move the passenger would all be factual events contributing to the death of the passenger. In the instant case, the same can be said: The exposure to the smoke and the refusal to assist the passenger are happenings that both contributed to the passenger's death.

And petitioner's argument that the flight attendant's failure to act cannot constitute an "accident" because only affirmative acts are "event[s] or happening[s]" under *Saks* is unavailing. 470 U. S., at 405. The distinction between action and inaction, as petitioner uses these terms, would perhaps be relevant were this a tort law negligence case. But respondents do not advocate, and petitioner vigorously rejects, that a negligence regime applies under Article 17 of the Convention. The relevant "accident" inquiry under

*Saks* is whether there is "an unexpected or unusual *event or happening." Ibid.* (emphasis added). The rejection of an explicit request for assistance would be an "event" or "happening" under the ordinary and usual definitions of these terms. See American Heritage Dictionary 635 (3d ed. 1992) ("event": "[s]omething. that takes place; an occurrence"); Black's Law Dictionary 554–555 (6th ed. 1990) ("event": "Something that happens"); Webster's New International Dictionary 885 (2d ed. 1949) ("event": "The fact of taking place or occurring; occurrence" or "[t]hat which comes, arrives, or happens").[9]

---

[9] The dissent cites two cases from our sister signatories England and Australia—*Deep Vein Thrombosis and Air Travel Group Litigation,* [2004] Q. B. 234, and *Qantas Ltd.* v. *Povey,* [2003] VSCA 227, ¶ 17, 2003 WL 23000692, ¶ 17 (Dec. 23, 2003) (Ormiston, J. A.), respectively—and suggests that we should simply defer to their judgment on the matter. But our conclusion is not inconsistent with *Deep Vein Thrombosis and Air Travel Group Litigation,* where the England and Wales Court of Appeal commented on the District Court and Court of Appeals opinions in this case, and agreed that Dr. Hanson's death had resulted from an accident. The English court reasoned: "The refusal of the flight attendant to move Dr. Hanson cannot properly be considered as mere inertia, or a non-event. It was a refusal to provide an alternative seat which formed part of a more complex incident, whereby Dr. Hanson was exposed to smoke in circumstances that can properly be described as unusual and unexpected." [2004] Q. B., at 254, ¶ 50.

To the extent that the precise reasoning used by the courts in *Deep Vein Thrombosis and Air Travel Group Litigation* and *Povey* is inconsistent with our reasoning, we reject the analysis of those cases for the reasons stated in the body of this opinion. In such a circumstance, we are hesitant to "follo[w]" the opinions of intermediate appellate courts of our sister signatories, *post,* at 658 (SCALIA, J., dissenting). This is especially true where there are substantial factual distinctions between these cases, see [2004] Q. B., at 248, ¶ 29 (confronting allegations of a "failure to warn of the risk of [deep-vein thrombosis], or to advise on precautions which would avoid or minimise that risk"); VSCA 227, ¶ 3, 2003 WL 23000692, ¶ 3 (noting plaintiff alleged a failure to provide "any information or warning about the risk of [deep-vein thrombosis] or of any measures to reduce

Moreover, the fallacy of petitioner's position that an "accident" cannot take the form of inaction is illustrated by the following example. Suppose that a passenger on a flight inexplicably collapses and stops breathing and that a medical doctor informs the flight crew that the passenger's life could be saved only if the plane lands within one hour. Suppose further that it is industry standard and airline policy to divert a flight to the nearest airport when a passenger otherwise faces imminent death. If the plane is within 30 minutes of a suitable airport, but the crew chooses to continue its cross-country flight, "[t]he notion that this is not an unusual event is staggering." *McCaskey* v. *Continental Airlines, Inc.*, 159 F. Supp. 2d 562, 574 (SD Tex. 2001).[10]

Confirming this interpretation, other provisions of the Convention suggest that there is often no distinction between action and inaction on the issue of ultimate liability. For example, Article 25 provides that Article 22's liability cap does not apply in the event of "wilful misconduct or . . . such *default* on [the carrier's] part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct." 49 Stat. 3020 (emphasis added).[11] Because liability can be imposed for death

---

the risk"), and where the respective courts of last resort—the House of Lords and High Court of Australia—have yet to speak.

[10] We do not suggest—as the dissent erroneously contends—that liability must lie because otherwise "harsh. results," *post*, at 664 (opinion of SCALIA, J.), would ensue. This hypothetical merely illustrates that the failure of an airline crew to take certain necessary vital steps could quite naturally and, in routine usage of the language, be an "event or happening."

[11] The Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules relating to International Carriage by Air (1975) amends Article 25 by replacing "wilful misconduct" with the language "done with intent to cause damage or recklessly and with knowledge that damage would probably result," as long as the airline's employee or agent was acting "within the scope of his employment." S. Exec. Rep. No. 105–20, p. 29 (1998). In 1998, the United States gave its advice and

or bodily injury only in the case of an Article 17 "accident" and Article 25 only lifts the caps once liability has been found, these provisions read together tend to show that inaction can give rise to liability. Moreover, Article 20(1) makes clear that the "due care" defense is unavailable when a carrier has *failed* to take "all necessary measures to avoid the damage." *Id.*, at 3019. These provisions suggest that an air carrier's inaction can be the basis for liability.

Finally, petitioner contends that the Ninth Circuit improperly created a negligence-based "accident" standard under Article 17 by focusing on the flight crew's negligence as the "accident." The Ninth Circuit stated: "The failure to act in the face of a known, serious risk satisfies the meaning of 'accident' within Article 17 so long as reasonable alternatives exist that would substantially minimize the risk and implementing these alternatives would not unreasonably interfere with the normal, expected operation of the airplane." 316 F. 3d, at 837. Admittedly, this language does seem to approve of a negligence-based approach. However, no party disputes the Ninth Circuit's holding that the flight attendant's conduct was "unexpected and unusual," *ibid.*, which is the operative language under *Saks* and the correct Article 17 analysis.

For the foregoing reasons, we conclude that the conduct here constitutes an "accident" under Article 17 of the Warsaw Convention. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of this case.

---

consent to ratification of the protocol, and it entered into force in the United States on March 4, 1999. See *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S. 155, 174, n. 14 (1999). Because the facts here took place in 1997–1998, Montreal Protocol No. 4 does not apply.

JUSTICE SCALIA, with whom JUSTICE O'CONNOR joins as to Parts I and II, dissenting.

When we interpret a treaty, we accord the judgments of our sister signatories "'considerable weight.'" *Air France* v. *Saks*, 470 U. S. 392, 404 (1985). True to that canon, our previous Warsaw Convention opinions have carefully considered foreign case law. See, *e. g., El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng,* 525 U. S. 155, 173–174 (1999); *Eastern Airlines, Inc.* v. *Floyd,* 499 U. S. 530, 550–551 (1991); *Saks, supra,* at 404. Today's decision stands out for its failure to give any serious consideration to how the courts of our treaty partners have resolved the legal issues before us.

This sudden insularity is striking, since the Court in recent years has canvassed the prevailing law in other nations (at least Western European nations) to determine the meaning of an American Constitution that those nations had no part in framing and that those nations' courts have no role in enforcing. See *Atkins* v. *Virginia,* 536 U. S. 304, 316–317, n. 21 (2002) (whether the Eighth Amendment prohibits execution of the mentally retarded); *Lawrence* v. *Texas,* 539 U. S. 558, 576–577 (2003) (whether the Fourteenth Amendment prohibits the criminalization of homosexual conduct). One would have thought that foreign courts' interpretations of a treaty that their governments adopted jointly with ours, and that they have an actual role in applying, would be (to put it mildly) all the more relevant.

The Court's new abstemiousness with regard to foreign fare is not without consequence: Within the past year, appellate courts in both England and Australia have rendered decisions squarely at odds with today's holding. Because the Court offers no convincing explanation why these cases should not be followed, I respectfully dissent.

I

The Court holds that an airline's mere inaction can constitute an "accident" within the meaning of the Warsaw Con-

vention. *Ante*, at 654–657. It derives this principle from our definition of "accident" in *Saks* as "an unexpected or unusual event or happening that is external to the passenger." 470 U.S., at 405. The Court says this definition encompasses failures to act like the flight attendant's refusal to reseat Hanson in the face of a request for assistance.

That is far from clear. The word "accident" is used in two distinct senses. One refers to something that is unintentional, not "on purpose"—as in, "the hundred typing monkeys' verbatim reproduction of War and Peace was an accident." The other refers to an unusual and unexpected event, intentional or not: One may say he has been involved in a "train accident," for example, whether or not the derailment was intentionally caused. As the Court notes, *ante*, at 651, n. 6, *Saks* adopted the latter definition rather than the former. That distinction is crucial because, while there is no doubt that inaction can be an accident in the former sense ("I accidentally left the stove on"), whether it can be so in the latter sense is questionable.

Two of our sister signatories have concluded that it cannot. In *Deep Vein Thrombosis and Air Travel Group Litigation*, [2004] Q. B. 234, England's Court of Appeal, in an opinion by the Master of the Rolls that relied heavily on *Abramson* v. *Japan Airlines Co.*, 739 F. 2d 130 (CA3 1984), and analyzed more than a half-dozen other non-English decisions, held as follows:

> "A critical issue in this appeal is whether a failure to act, or an omission, can constitute an accident for the purposes of article 17. Often a failure to act results in an accident, or forms part of a series of acts and omissions which together constitute an accident. In such circumstances it may not be easy to distinguish between acts and omissions. I cannot see, however, how inaction itself can ever properly be described as an accident. It is not an event; it is a non-event. Inaction is the antith-

esis of an accident." [2004] Q. B., at 247, ¶ 25 (Lord Phillips, M. R.).

Six months later, the appellate division of the Supreme Court of Victoria, Australia, in an opinion that likewise gave extensive consideration to American and other foreign decisions, agreed:

> "The allegations in substance do no more than state a failure to do something, and this cannot be characterised as an event or happening, whatever be the concomitant background to that failure to warn or advise. That is not to say that a failure to take a specific required step in the course of flying an aircraft, or in picking up or setting down passengers, cannot lead to an event or happening of the requisite unusual or unexpected kind and thus be an accident for the purpose of the article. A failure by a pilot to use some device in the expected and correct manner, such as a failure to let down the landing wheels or a chance omission to adjust the level of pressurisation, may lead, as has been held, to an accident contemplated by Article 17, but I would venture to suggest that it is not the failure to take the step which is properly to be characterised as an accident but rather its immediate and disastrous consequence whether that be the dangerous landing on the belly of the aircraft or an immediate unexpected and dangerous drop in pressurisation." *Qantas Ltd.* v. *Povey*, [2003] VSCA 227, ¶ 17, 2003 WL 23000692 (Dec. 23, 2003) (Ormiston, J. A.).

We can, and should, look to decisions of other signatories when we interpret treaty provisions. Foreign constructions are evidence of the original shared understanding of the contracting parties. Moreover, it is reasonable to impute to the parties an intent that their respective courts strive to interpret the treaty consistently. (The Warsaw Convention's preamble specifically acknowledges "the advantage of regulating *in a uniform manner* the conditions of . . . the liability

of the carrier." 49 Stat. 3014 (emphasis added).) Finally, even if we disagree, we surely owe the conclusions reached by appellate courts of other signatories the courtesy of respectful consideration.

The Court nonetheless dismisses *Deep Vein Thrombosis* and *Povey* in a footnote responding to this dissent. *Ante,* at 655–656, n. 9. As to the former, it claims (choosing its words carefully) that the *"conclusion"* it reaches is "not inconsistent" with that case. *Ante,* at 655, n. 9 (emphasis added). The reader should not think this to be a contention that the Master of the Rolls' opinion might. be read to agree with today's holding that inaction can constitute an "accident." .(To repeat the conclusion of that opinion: "Inaction is the antithesis of an accident." [2004] Q. B., at 247, ¶ 25.) What it refers to is the fact that the Master of the Rolls distinguished the Court of Appeals' judgment below (announced in an opinion that assumed inaction was involved, but did not at all discuss the action-inaction distinction) on the ground that action *was* involved—namely, "insistence that [Hanson] remain seated in the area exposed to smoke." *Id.,* ¶ 50.[1] As I explain below, see Part II, *infra,* that theory does not quite work because,

---

[1] The Court quotes only part of the relevant discussion. Here is what the Master of the Rolls said about our case in full:

"I have no difficulty with the result in this case but, with respect, I question the reasoning of the judge in both events. *The refusal of the flight attendant to move Dr. Hanson cannot properly be considered as mere inertia, or a non-event.* It was a refusal to provide an alternative seat which formed part of a more complex incident, whereby Dr. Hanson was exposed to smoke in circumstances that can properly be described as unusual and unexpected. The existence of the non-smoking zone provided the opportunity for Dr. Hanson, if suitably placed within it, to avoid exposure to the smoke that threatened his health and, as it proved, his life. The direct cause of his death was the unnecessary exposure to the smoke. *The refusal of the attendant to move him could be described as insistence that he remain seated in the area exposed to smoke.* The exposure to smoke in these circumstances could, in my view, properly be described as an unusual or unexpected event." *Deep Vein Thrombosis and Air Travel Group Litigation,* [2004] Q. B. 234, 254, ¶ 50 (emphasis added).

in fact, the flight attendant did *not* insist that Hanson remain seated. But we can ignore this detail for the time being. The point is that the English court thought Husain could recover, not because the action-inaction distinction was irrelevant, but because, even though action was indispensable, it had in fact occurred.

The Court charts our course in exactly the opposite direction, spending three pages explaining why the action-inaction distinction *is* irrelevant. See *ante*, at 654–657. If the Court agrees with the Master of the Rolls that this case involves action, why does it needlessly place us in conflict with the courts of other signatories by deciding the then-irrelevant issue of whether inaction can constitute an accident? It would suffice to hold that our case involves action and end the analysis there. Whether inaction can constitute an accident under the Warsaw Convention is a significant issue on which international consensus is important; whether Husain can recover for her husband's death in this one case is not. As they stand, however, the core holdings of this case and *Deep Vein Thrombosis*—their *rationes decidendi*— are not only *not* "not inconsistent"; they are *completely opposite.*[2]

---

[2] To the extent the Court implies that *Deep Vein Thrombosis* and *Povey* merit only slight consideration because they were not decided by courts of last resort, see *ante*, at 655–656, n. 9, I note that our prior Warsaw Convention cases have looked to decisions of intermediate appellate foreign courts as well as supreme courts. See *Air France* v. *Saks*, 470 U. S. 392, 404 (1985). Moreover, *Deep Vein Thrombosis* was no ordinary decision. It was authored by the Master of the Rolls, the chief judge of England's civil appellate court—a position thought by many to be even more influential than that of a Law Lord. See, *e. g.*, Smith, Bailey & Gunn on the Modern English Legal System 250 (4th ed. 2002); Denning: A Life of Law, BBC News (Mar. 5, 1999), http://news.bbc.co.uk/1/hi/uk/290996.stm (as visited Jan. 20, 2004, and available in Clerk of Court's case file).

That there are "substantial factual distinctions" between the cases, *ante*, at 655, n. 9, is surely beside the point. A legal rule may arise in different contexts, but the differences are relevant only if the logic of the rule makes them so. *Deep Vein Thrombosis* and *Povey* hold in no uncertain

I would follow the holdings of *Deep Vein Thrombosis* and *Povey*, since the Court's analysis today is no more convincing than theirs. Merely pointing to dictionaries that define "'event'" as an "'occurrence'" or "'[s]omething that happens,'" *ante*, at 655, hardly resolves the problem; it only reformulates one question (whether "accident" includes nonevents) into an equivalent one (whether "accident" includes nonoccurrences and nonhappenings).

Equally unavailing is the reliance, *ante*, at 656–657, on Article 25 of the Warsaw Convention (which lifts liability caps for injury caused by a "default" of the airline equivalent to willful misconduct) and Article 20 (which precludes the airline's due-care defense if it fails to take "all necessary measures" to avoid the injury). The Court's analytical error in invoking these provisions is to assume that the inaction these provisions contemplate is the accident itself. The treaty imposes no such requirement. If a pilot negligently forgets to lower the landing gear, causing the plane to crash and killing all passengers on board, then recovery is presumptively available (because the crash that caused the deaths is an accident), and the due-care defense is inapplicable (because the pilot's negligent omission also caused the deaths), even though the omission is not the accident. Similarly, if a flight attendant fails to prevent the boarding of an individual whom she knows to be a terrorist, and who later shoots a passenger, the damages cap might be lifted even though the accident (the shooting) and the default (the failure to prevent boarding) do not coincide. Without the invented restriction that the Article 20 or 25 default be the accident itself, the Court's argument based on those provisions loses all force.

terms that inaction cannot be an accident; not that inaction *consisting of failure to warn of deep vein thrombosis* cannot be an accident. Maintaining a coherent international body of treaty law requires us to give deference to the *legal rules* our treaty partners adopt. It is not enough to avoid inconsistent decisions on factually identical cases.

As for the Court's hypothetical of the crew that refuses to divert after a passenger collapses, *ante,* at 656: This would be more persuasive as a *reductio ad absurdum* if the Eleventh Circuit had not already ruled out Article 17 liability in substantially these very circumstances. See *Krys* v. *Lufthansa German Airlines,* 119 F. 3d 1515, 1517–1522, 1527–1528 (1997). A legal construction is not fallacious merely because it has harsh results. The Convention denies a remedy, even when outrageous conduct and grievous injury have occurred, unless there has been an "accident." Whatever that term means, it certainly does not equate to "outrageous conduct that causes grievous injury." It is a mistake to assume that the Convention must provide relief whenever traditional tort law would do so. To the contrary, a principal object of the Convention was to promote the growth of the fledgling airline industry by limiting the circumstances under which passengers could sue. See *Tseng,* 525 U. S., at 170–171. Unless there has been an accident, there is no liability, whether the claim is trivial, cf. *Lee* v. *American Airlines Inc.,* 355 F. 3d 386, 387 (CA5 2004) (suit for "loss of a 'refreshing, memorable vacation'"), or cries out for redress.

Were we confronting the issue in the first instance, perhaps the Court could persuade me to its view. But courts in two other countries have already rejected it, and their reasoning is no less compelling than the Court's. I would follow *Deep Vein Thrombosis* and *Povey* and hold that mere inaction cannot be an "accident" under Article 17.

## II

Respondents argue that, even if the Convention distinguishes action from inaction, this case involves sufficient elements of action to support recovery. That argument is not implausible; as noted earlier, the court in *Deep Vein Thrombosis* suggested that "[t]he refusal of the attendant to move [Hanson] could be described as insistence that he remain seated in the area exposed to smoke." [2004] Q. B., at 254,

¶ 50.   I cannot agree with this analysis, however, because it miscomprehends the facts of this case.

Preliminarily, I must note that this was not the rationale of the District Court.   That court consistently referred to the relevant "accident" not as the flight attendant's insistence that Hanson remain seated, but as her "failure" or "refusal" to reseat him.   See 116 F. Supp. 2d 1121, 1131–1135 (ND Cal. 2000).   Its findings of fact were infected by its erroneous legal assumption that Article 17 makes no distinction between action and inaction.   The only question is whether we can nonetheless affirm on the ground that, since there *was* action in any event, this error was harmless.

It was not.   True, in response to the *first* request, the flight attendant insisted that Husain and her husband " 'have a seat.' "   *Id.*, at 1125.   This insistence might still have been implicit in her response to the second request.   But these responses were both given while the plane was still on the ground, preparing to take off.   The flight attendant's response to Husain's *third* request—made once the plane was in the air and other passengers had started smoking—was quite different.   She did *not* insist that Husain and her husband remain seated; on the contrary, she invited them to walk around the cabin in search of someone willing to switch.

That the flight attendant explicitly refused Husain's pleas for help after the third request, rather than simply ignoring them, does not transform her inaction into action.   The refusal acknowledged her inaction, but it was the inaction, not the acknowledgment, that caused Hanson's death.   Unlike the previous responses, the third was a mere refusal to assist, and so cannot be the basis for liability under Article 17.

The District Court's failure to make the distinction between the flight attendant's pretakeoff responses and her inflight response undermines its decision in two respects. First, the court's findings as to airline and industry policy did not distinguish between reseating a passenger while in flight and reseating a passenger while still on the ground

preparing to take off. In fact, some of the evidence on this point specifically related *only* to in-flight behavior. See *id.*, at 1132 (testimony of a chief cabin attendant that the flight attendant should have reseated Hanson immediately after Husain's *third* request); *ibid.* (testimony of a company official that its policy is to move passengers "who become ill *during* flights" (emphasis added)). To establish that it is company policy to reseat an asthmatic does *not* establish that it is company policy to do so before takeoff, while the attendants are busy securing the plane for departure and before anyone has started smoking. In other words, there may have been nothing unusual about the initial insistence that Hanson stay seated, and for that reason no "accident." We do not know the policy in this more specific regard. The District Court made no findings because it applied an erroneous legal standard that did not require it to distinguish among the three requests.

But even if the flight attendant's insistence that Hanson remain seated before takeoff *was* unusual or unexpected, and hence an accident, it was not a *compensable cause* of Hanson's death. It was perhaps a but-for cause (had the flight attendant allowed him to move before takeoff, he might have lived, just as he might have lived if he had taken a different flight); but it was not a *proximate* cause, which is surely a predicate for recovery. Any early insistence that Hanson remain seated became moot once the attendant later told Husain and her husband they were free to move about.

There is, however, one complication, which I think requires us to remand this case to the District Court: Although the flight attendant, once the plane was aloft, invited Husain to find another passenger willing to switch seats, she did not invite Husain to find an *empty* seat, but to the contrary affirmatively represented that the plane was full. If such a misrepresentation is unusual and unexpected; and (the more difficult question) if it can reasonably be said that it caused Hanson's death—*i. e.*, that Husain would have searched for

and found an empty seat, although unwilling to ask another passenger to move—then a cause of action might lie. I would remand so that the District Court could consider in the first instance whether the flight attendant's misrepresentation about the plane's being full, independent of any failure to reseat, was an accident that caused Hanson's death.

\* \* \*

Tragic though Dr. Hanson's death may have been, it does not justify the Court's putting us in needless conflict with other signatories to the Warsaw Convention. I respectfully dissent.