HENRY, Circuit Judge,
concurring:
Although I concur in the outcome of this case, I write separately to address two issues. Turning first to N-A-M’s claim that only aggravated felonies constitute “particularly serious crimes,” although Chevron deference directs us to affirm the Bureau of Immigration Appeals’ (BIA) rejection of this argument and this provision presents no Chevron exception, it is worth noting that our immigration statutory framework is notoriously complex and the meaning of the statutory language has been a moving target since its inception.
Second, I think that the gravamen of this case involves whether the Refugee Act’s withholding of removal provision, 8 U.S.C. § 1231(b)(3)(b)(ii), which incorporates our obligations under the United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), requires an inquiry into both whether N-A-M has been convicted of a “particularly serious” offense and constitutes a “danger to the community.” Stare decisis binds us to the language of Al-Salehi v. INS, 47 F.3d 390, 393 (10th Cir.1995), which affirmed the BIA’s determination that § 1231 does not require a separate inquiry into whether an alien constitutes a danger to the community.
I find, however, N-A-M and amici’s arguments persuasive that the interpretation from Al-Salehi is at odds with the language of § 1231, with some basic principles of statutory construction, the purpose and intent behind the Refugee Act, and the international legal principles embodied in the Refugee Act. I urge the Attorney General and the Secretary of State to consider the arguments of amici here, the treaty underlying this provision, and the jurisprudence of fellow signatories to the underlying international commitments. Perhaps the BIA should consider reverting to its previous standards.

I. Section 1231’s “particularly serious’’ offense inquiry is a moving target and fickle standard.

In light of the absence of explanatory statutory language defining “particularly serious” for purposes of § 1231, we give the BIA’s construction Chevron deference. Brue v. Gonzales, 464 F.3d 1227, 1234 (10th Cir.2006); Mosquera-Perez v. INS, 3 F.3d 553 (1st Cir.1993). I believe it is important to note, however, that several Congressional amendments, substantive administrative changes by the BIA, and a circuit split, subject the provision to different interpretations.
Originally, Congress enacted 8 U.S.C. § 1253(h), now § 1231, in response to our ratification of Protocol 33 to the United Nations’ Refugee Convention. Under § 1253(h), withholding was denied to those aliens who “having been convicted by a final judgment of a particularly serious crime, constitute[] a danger to the community of the United States ” (emphasis added). Under this amendment, the BIA determined on a case-by-case basis which crimes were particularly serious, applying *1059 the test articulated by the BIA in Matter of Frentescu, 18 I. & N. Dec. 244, 247 (BIA 1982) (“In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.”). Subsequently the BIA identified a class of crimes as inherently particularly serious, so as to eliminate the case-by-case determinations in those cases. See, e.g., Matter of Garcia-Garrocho, 19 I. & N. Dec. 423, 425 (BIA 1986) (“We find that the applicant’s conviction for burglary in the first degree is within the category of crimes that are per se ‘particularly serious.’ ”).
The statutory provision barring “particularly serious” criminals from eligibility from withholding of removal has been subjected to three amendments. With the Immigration Act of 1990, Pub.L. No. 101— 649, 104 Stat. 4978, Congress established a per se category of “particularly serious” criminals comprised of aliens convicted of aggravated felonies.
In 1996, with the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, 1269 (1996), Congress, in order to comply with agreed to international obligations, relaxed its categorical bar on aggravated felons. Delgado v. Holder, 563 F.3d 863, 869 (9th Cir.2009). Congress amended § 1253(h) to permit the Attorney General to overcome the per se rule banning aggravated felons where “necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.” Id. (citing the AEDPA, Pub.L. No. 104-132, 110 Stat. 1214, 1269).
Congress addressed this provision again in 1996 with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (“IIRIRA”), Division C of Pub.L. No. 104-208, 110 Stat. 3009-546, 3009-602. The IIRIRA Amendments create the statute’s current form and categorically apply a bar from withholding those aggravated felons sentenced to five years’ or more imprisonment. Id.
Our resolution of the issue presented in this case turns on the meaning behind Congress’s post-1990 statutory enactments. Congress’s seeming relaxation of the categorical aggravated felony bar suggests an effort to avoid the inclusion of minor crimes in the class of per se “particularly serious” offenses. The extent of that relaxation, however, is subject to debate — or, at least, has been subject to debate both within the administrative agency, as discussed in Section II, and among the courts. Compare Ali v. Achim, 468 F.3d 462, 470 (7th Cir.2006) (noting that § 1231 “does not state a general rule that only aggravated felonies can be considered” particularly serious crimes) with Alaka v. Atty. Gen’l of the U.S., 456 F.3d 88, 105 (3d Cir.2006) (“We therefore conclude that an offense must be an aggravated felony in order to be classified as a ‘particularly serious crime.’ ”).
The BIA has developed administrative standards for determining what constitutes a particularly serious crime. These standards, however, appear to be somewhat in flux. With Frentescu in 1982, the BIA articulated four factors relevant to the § 1231 (at that time, the § 1253(h)) inquiry. Specifically (and logically for that matter), the BIA noted that, “[i]n judging the seriousness of a crime, we look to such factors as [1] the nature of the conviction, [2] the circumstances and underlying facts of the conviction, [3] the type of sentence imposed, and, most importantly, [4] whether the type and circumstances of the crime indicate that the alien will be a *1060 danger to the community.” 18 I. & N. Dec. at 247 (emphasis added).
But over time, however, the BIA retreated substantially from Frentescu’s danger-to-the-community prong. In the BIA’s 1992 decision, Matter of C-, the BIA suggested that, except in the ease of the aggravated felony, Frentescu remained the administrative standard in terms of defining “particularly serious” offenses. See Matter of C-, 20 I. & N. Dec. 529, 534 n. 3 (BIA 1992) (“There will of course continue to be situations requiring a determination whether a ‘particularly serious crime’ exists under Frentescu; such is the case, for example, where the crime does not technically qualify as an aggravated felony under the Act based on the conviction date.”). Despite the clear presence of the phrase in the statute and the logical pronouncement in Frentescu that the phrase is the most important factor, the “danger to the community” prong is now absent from the BIA’s reiteration of the relevant factors in this case. See In re N-A-M, 24 I. & N. Dec. 336, at 342 (BIA 2007) (“[W]e examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction.” (citing Matter of Q-T-M-T- 21 I. & N. Dec. 639 (BIA 1996))). In fact, it appears that the BIA may now disregard Frentescu altogether. Id. (“On some occasions, we have focused exclusively on the elements of the offense, i.e., the nature of the crime.”); but see Brue, 464 F.3d at 1234 (affirming the BIA’s use of the proper legal standard when it used only “two of the [four] Frentescu factors, including the most important one, danger to the community”). Indeed, in this case, the BIA expressed its conclusion that N-A-M satisfies the “particularly serious” crime element on the basis of the elements of the offense alone. 24 I. & N. Dec. at 342-43 (“We find that the respondent’s offense is a particularly serious crime based solely on its elements.”).
Our precedent requires us to defer to the BIA’s reasonable construction of § 1231, and we abide by it here. I note, however, that the BIA’s continually competing and definitionally inconsistent constructions of § 1231 frustrate our function as a reviewing court and threaten the reasonableness of its interpretations.

II. N-A-M and amici make persuasive arguments that Al-Salehi is contrary to 8 U.S.C. § mi.

The Immigration Judge summarily stated that N-A-M constituted a danger to the community that statutorily barred the withholding of removal, a finding that may indeed be factually true as well as legally affirmable. The Immigration Judge, however, did not engage in an analysis as to whether N-A-M actually constituted a danger to the community either under Frentescu or any other model. Presumably, the absence of such an analysis is because, as the BIA has now construed § 1231, “this [inquiry] is subsumed within the determination that the crime is a particularly serious one.” Aple’s Br. at 30; see In Matter of Carballe, 19 I. & N. Dec. 357, 360 (1986) (“The phrase ‘danger to the community’ is an aid to defining a ‘particularly serious crime.... ’ ”).
Although the circuit consensus, including that of our own, see Al-Salehi v. INS, 47 F.3d 390 (10th Cir.1995), is that Chevron calls for deference, the BIA’s stance on the “danger to the community” element of § 1231 has been the concern of at least one other circuit. The Second Circuit, in interpreting the meaning of that statute, stated that they are “troubled by the BIA’s failure to give separate consideration to whether [petitioner] is a ‘danger to the community.’ ” Ahmetovic v. I.N.S., 62 F.3d 48, 52 (2d Cir.1995).
*1061 Although our decision in Al-Salehi has been interpreted by other circuits to stand for the blanket proposition that satisfaction of the “particularly serious” offense element of § 1231 is sufficient to deny withholding, see, e.g., Ahmetovic, 62 F.3d at 54; Alaka, 456 F.3d at 95, our Al-Salehi decision contains some important qualifying language. Specifically, we stated in Al-Salehi that the BIA’s interpretation “in this proceeding” is entitled to deference, and “Petitioner, who concedes his prior conviction of an aggravated felony, is ... disqualified;” and “in light of th[e] uncertainty [about the meaning of the (Refugee) Convention], we conclude that the BIA’s interpretation of [§ 1253(h)(2)] does not violate Article 33(2).” See Al-Salehi, 47 F.3d at 395, 396 (internal quotation marks omitted).
It is important that the facts in AlSalehi were different: Mr. Al-Salehi was convicted of an aggravated felony. Further, both the Seventh Circuit’s decision in Garcia v. INS, 7 F.3d 1320 (7th Cir.1993), upon which Al-Salehi relied, and In Matter of Carballe, 19 I. & N. Dec. 357, relied upon by the Seventh Circuit, involved aggravated felons. There is also a meritorious argument that our rule governing aggravated felons might not apply to non-aggravated felons, such as N-A-M, or might not apply with the same force. Indeed, another provision in the Immigration and Nationality Act (“INA”) indicates that the two substantively distinct categories of offenses — aggravated felonies and non-aggravated felonies — receive disparate treatment under the INA. See, e.g., Chong v. Dist. Dir. INS, 264 F.3d 378, 385 (3d Cir.2001) (“The INA bars aggravated felons from entering the United States for ten years. 8 U.S.C. § 1182(a)(9)(A)(ii). [However] a determination that the [ ] petitioner’s conviction did not constitute an aggravated felony could allow the petitioner to reenter the United States.”).
Furthermore, I see some unnerving textual impediments to the BIA’s construction. Notably, a statute must be ambiguous or unclear before Chevron comes into play, see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the statutory language is arguably unambiguous. One of the most basic interpretive canons counsels that “[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant....” Hibbs v. Winn, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004). To accept the BIA’s recent contention that the “danger to the community” inquiry is subsumed within the “particularly serious” offense inquiry seems to run afoul of the clear language of the statute. The statute mentions both a “danger to the community” inquiry and a “particularly serious” offense inquiry; ignoring one of those inquiries does not give full effect to the meaning to the statute. And, then to take it one step further and to contend that the “particularly serious” offense inquiry can be performed without reference to Frentescu’s “danger to the community” element, as the BIA does, seems doubly problematic. See N-A-M, 24 I. & N. Dec. at 342 (“On some occasions, we have focused exclusively on the elements of the offense, i.e., the nature of the crime.”).
For the reasons above, arguments made by the amicus, United Nations High Commissioner for Refugees (UNHCR) (to whom our Supreme Court has consistently turned for assistance in interpreting our obligations under the Refugee Convention), are noteworthy. See, e.g., Negusie v. Holder, — U.S. -, 129 S.Ct. 1159, 1175, 173 L.Ed.2d 20 (2009) (citing Office of the United Nations High Commissioner for Refugees, Handbook on Procedures *1062 and Criteria for Determining Refugee Status ¶¶ 157, 162 (reedited Jan. 1992) in support of its analysis of the nonrefoulement (the mandatory withholding of deportation) principle); Sale v. Haitian Ctrs. Council, 509 U.S. 155, 182, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (same); INS v. Cardoza-Fonseca, 480 U.S. 421, 438-39, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (“In interpreting the Protocol ... we are further guided by the analysis set forth in the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979).”).
As UNHCR notes, our Refugee Act, which implements the Refugee Convention, and specifically, § 1231, embodies a Congressional commitment to the international legal principle of nonrefoulement, as it appears in Refugee Convention Article 33. See INS v. Stevic, 467 U.S. 407, 421, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984) (discussing 8 U.S.C. § 1253(h), now codified at 8 U.S.C. § 1231(b)(3) (2006), and noting that the statutory provision regarding withholding of deportation, as amended, conformed to the language of Article 33); see also Ins v. Cardoza-Fonseca, 480 U.S. 421, 441 n. 25, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (stating that “[t]he 1980 Act made withholding of deportation under [INA] § 243(h) mandatory in order to comply with Article 33.1”). And a wealth of persuasive authority reveals that under both the Convention and the Refugee Act implementing the Convention, the “decisive factor is not the seriousness or categorization of the crime that the refugee has committed, but, rather, whether the refugee, in light of the crime and conviction, poses a future danger to the community.” UNCHR Am. Br. at 22 (listing several citations).
We can also benefit from reference to international law, as it reveals how other tribunals have interpreted the exact same text. Although citing foreign law is at times controversial, the broad consensus, even among opponents of its use in constitutional law cases, supports its use when determining how other signatories on a treaty interpret that treaty. As Justice Sealia wrote in dissent in Olympic Airways v. Husain:
[The] decision stands out for its failure to give any serious consideration to how the courts of our treaty partners have resolved the legal issues before us....
The Court’s new abstemiousness with regard to foreign fare is not without consequence: Within the past year, appellate courts in both England and Australia have rendered decisions squarely at odds with today’s holding. Because the Court offers no convincing explanation why these cases should not be followed, I respectfully dissent.
540 U.S. 644, 658, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004) (Scalia, J., dissenting); see Air France v. Saks, 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) (“[W]e ‘find the opinions of our sister signatories to be entitled to considerable weight.’ ” (quoting Benjamins v. British European Airways, 572 F.2d 913, 919 (2d Cir.1978))).
As pointed out by the Amicus brief from legal scholars, Deborah Anker, Guy S. Goodwin-Gill, and James Hathaway, the interpretation of the international convention by courts in Canada and the United Kingdom differs from our analysis. In interpreting the underlying international convention, the Supreme Court of Canada noted that a government must “make the added determination that the person poses a danger to the safety of the public or to the security of the country ... to justify refoulment.” Pushpanathan, v. Minister of Citizenship & Immigration, [1998] 1 S.C.R. 982, ¶ 12. Similarly, the United *1063 Kingdom considers whether an alien is “convicted of a particularly serious crime and is a danger to the community.” Immigration and Nationality Appeals Directorate, Changes to Refugee Leave and Humanitarian Protection (2005) (quoted in R v. Sec’y of State for Home Dep't, [2006] EWHC 3513 (Eng.Q.B.2006)). That other countries — especially, perhaps, these — have interpreted the treaty to have a different meaning from the BIA, calls into question the interpretation made by the BIA and reveals the need for clarification on the correct meaning.
In conclusion, although the meaning of § 1231’s “particularly serious” offense provision is not crystal clear, the BIA’s construction of the provision to include non-aggravated felonies is reasonable. Furthermore, in light of our decision in Alr-Salehi, 47 F.3d at 390, we must affirm the BIA’s exclusion of a “danger to the community” assessment from § 1231. Nevertheless, N-A-M and amici raise noteworthy arguments that merit the separate discussion of this concurrence and hopefully will draw further scrutiny to this matter.