**In re UAL Corporation, et al., Debtors.**

**No. 02 B 48191.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 2, 2004.

James H.M. Sprayregen, Marc Kieselstein, David R. Seligman, Michael B. Slade, Kirkland & Ellis, LLP, Mark Ter Molen, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, for Debtors.

Ira Rogal, Shea, Rogal & Assocs., LaGrange, IL, Perry R. Sanders, Jr., Brent L. Chism, Sanders, Crochet & Chism, LLP, Lake Charles, LA, David Wallace, DeRidder, LA, for Richard and Sharon Dorazio.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Chief Judge.

These jointly administered Chapter 11 cases are before the court on the debtors' objection to a $6 billion claim asserted by Richard Dorazio, M.D. and Sharon Dorazio against one of the debtors, United Air Lines ("United"). The claim is based on a class action lawsuit filed by the Dorazios seeking damages for personal injuries suffered as a result of "disinsection" of United's aircraft flying into Australia and New Zealand.[1] The debtors have objected to the claim on several grounds, including that the claim does not arise from an "accident," as required for personal injury recovery under the Warsaw Convention. In response, the Dorazios have argued both that the bankruptcy court lacks jurisdiction to rule on the objection and that their claim does arise from an "accident" under the Warsaw Convention. For the reasons set out below, this court has jurisdiction to consider the objection, and the objection is well founded. Accordingly, the Dorazios' claim will be disallowed.

## Jurisdiction

This court's jurisdiction over the pending claim objection is one of the questions in dispute and is addressed in the legal discussion following the statement of facts.

## Statement of Facts

The basis of the Dorazios' claim is set out in a complaint that they filed in the Circuit Court of Cook County, Illinois in Case No. 01 L 10592. The facts alleged in that complaint, which the debtors accept as true for purposes of the pending objection, can be summarized as follows:

• All passenger aircraft operated by United between California and either Sydney, Australia or Auckland, New Zealand are regularly disinsected in order to qualify the aircraft for flight to Australia or New Zealand. (Complaint, ¶¶ 8–10.)

• This disinsection involves both the use of residual insecticides, applied to the surfaces of crew and passenger compartments while the aircraft are on the ground, and the spraying of aerosol insecticides during flight. (Complaint, ¶¶ 11–12.)

• For many years, United has known that the insecticides used in this disinsection process have caused illness and injury to passengers, but United has chosen not to warn its passengers "that flying in [United's] disinsected aircraft causes certain passengers to experience noticeable bothersome symptoms that may be irritating and sensitizing." (Complaint, ¶¶ 15–17.)

• Specifically, United has been on notice that "approximately 2% of people exposed to the compounds used in [United's] aircraft disinsection process will be irritated thereby." (Complaint, ¶ 17.)

1. "Disinsection" appears to be a newly coined euphemism for insect extermination. It is not listed in older standard dictionaries, see, e.g., Webster's Third New International Dictionary 650 (1981), but can be found in some newer or specialized ones. For example, Webster's Medical Desk Dictionary 186 (1986) lists "disinsection" as a synonym for "disinsectization," which is defined as "removal of insects (as from aircraft)."

• In August 2000, the Dorazios flew in one of United's aircraft from Sydney, Australia to Los Angeles, and Sharon Dorazio "became very ill as a result of unauthorized exposure to pesticides used to disinsect the aircraft." (Complaint, ¶ 24.)

• The Dorazios seek to represent a class of passengers "who have flown in one or more of [United's] disinsected aircraft" (Complaint, ¶ 9), and Sharon Dorazio seeks to represent a "sub-class of passengers who reacted to the pesticide exposure by having a severe limited duration illness." (Complaint, ¶ 24.)

The Dorazios' bankruptcy attorneys have explained that the claim of $6 billion is based on an estimate of three million class members with damages of approximately $2,000 each.

In their objection to the Dorazios' claim, the debtors have asserted, without dispute from the Dorazios, that disinsection is legally required for all aircraft entering Australia and New Zealand. These requirements are addressed in currently available governmental publications of both countries. In particular, the New Zealand Ministry for Agriculture and Forestry Quarantine Service and the Australian Quarantine and Inspection Service have issued a joint "Schedule of Aircraft Disinsection Procedures," dated May 4, 2004, that explains and implements the disinsection requirements.[2] The Schedule states (§ 1.1) that pursuant to the New Zealand

Biosecurity Act 1993 and Regulation 23 of the Australian Quarantine Regulations 2000, "the master of an aircraft ... must make arrangements for the treatment of the aircraft in a manner approved by the Director of Quarantine for the purpose of destroying insects and disease vectors." A section of the Schedule titled "Justification" (§ 1.3) explains the purpose of the regulations:

The reason for disinsection of international aircraft is to help protect New Zealand and Australia from a range of vectors of human diseases, and pests of animal and plant quarantine concern entering New Zealand and Australia. Surveys have conclusively shown that such pests can be, and are, present in international aircraft and disease outbreaks have been traced to this source.

The balance of the Schedule sets out detailed requirements for aircraft disinsection, including the formulation of insecticidal sprays, the quantities of insecticide required for each type of aircraft, and the methods of application. If an aircraft has not been disinsected in conformity with the Schedule before landing, the Schedule provides (§ 7) that the aircraft "must be disinsected on its arrival under the supervision of a [government quarantine] Inspector."[3]

The Dorazios timely filed their proof of claim in the pending bankruptcy cases on May 5, 2003, the debtors filed their objection on February 4, 2004, and the parties

---

2. At the time of this decision, the report was available at http://www.affa.gov.au/content/publications.cfm?Category=Australian-QuarantineﬁxandInspectionService & ObjectID=9CE0AD01-6439-4E1B B51058EA34886322. Earlier versions of the applicable regulations, attached as Exhibit D to the debtors' claim objection, are substantially similar.

3. The U.S. Department of Transportation recognizes Australia and New Zealand as among

a minority of countries requiring aircraft disinsection. See *Aircraft Disinsection Requirements*, a report of the Office of Transportation Policy of the Department of Transportation, available at http://ostpxweb.dot.gov (last modified Feb. 24, 2004). The practice of disinsection appears to be a longstanding one. See *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 441 n. 60 (D.C.Cir.1976) (mentioning "disinsectization" as a common task of flight attendants).

have fully briefed the legal questions raised.

## Conclusions of Law

I. *Jurisdiction to disallow a personal injury claim on grounds not requiring trial.*

█ The Dorazios have questioned whether this court has jurisdiction to rule on the debtors' claim objection. The objection—insofar as it based on the Warsaw Convention—is a purely legal one, requiring no resolution of disputed facts. Thus, the initial issue here is whether a bankruptcy judge has jurisdiction to disallow a personal injury tort claim against a bankruptcy estate as a matter of law, rather on the basis of findings after trial.

█ A. *Constitutional limits of bankruptcy jurisdiction over claims against an estate.* Bankruptcy judges do not have the life tenure and protection from diminution of salary that Article III of the Constitution requires for federal judges. Accordingly, the Supreme Court held in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), that there are constitutional limits on the extent to which Congress can confer jurisdiction on bankruptcy judges. *Marathon* addressed the grant of jurisdiction originally supporting the 1978 Bankruptcy Code, which allowed non-Article III bankruptcy judges to enter judgments not only in all "civil proceedings arising under title 11 [the Bankruptcy Code] or arising in ... cases under title 11," but also in proceedings that were merely "related to" bankruptcy cases. *See* 28 U.S.C. § 1471(b) (1976 ed., Supp.IV) (repealed). *Marathon* held that this extensive jurisdictional grant exceeded Congress's power under Article I, § 8 of the Constitution to establish "uniform Laws on the subject of Bankruptcies." Specifically, the Court held that Congress might appro-

priately allow a non-Article III judge jurisdiction over matters that were central to the operation of a bankruptcy system, but not over "non-core" matters: "[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power must be distinguished from the adjudication of state-created private rights...." 458 U.S. at 71, 102 S.Ct. 2858 (plurality opinion).

█ It has long been recognized that one of the essential, "core" functions of bankruptcy is the allowance or disallowance of claims against the debtor's estate, without regard to the source of the claim.

> A bankruptcy court in which an estate is being administered has full power to inquire into the validity of *any* alleged debt or obligation of the bankrupt upon which a demand or claim against the estate is based. This is essential to the performance of the duties imposed upon it. When an alleged debt or obligation is ascertained to be invalid—without lawful existence—the claim based thereon is necessarily disallowed.

*Lesser v. Gray,* 236 U.S. 70, 74, 35 S.Ct. 227, 59 L.Ed. 471 (1915) (emphasis added). Later, in *Gardner v. State of New Jersey,* 329 U.S. 565, 573, 67 S.Ct. 467, 91 L.Ed. 504 (1947), the Supreme Court emphasized that bankruptcy courts are "duty bound" to pass on claim objections, stating that the claims resolution process is "of basic importance in the administration of a bankruptcy estate" and noting that without it, "unmeritorious or excessive claims might dilute the participation of the legitimate claimants."

The power of the bankruptcy court to resolve claims against the estate has been held to trump any right to jury trial that a claimholder would enjoy in pursuing the claim outside of bankruptcy. Indeed, in *Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), the Su-

preme Court held that a creditor who files a claim against an estate in bankruptcy not only submits that claim to the equitable jurisdiction of the bankruptcy court, but also brings within the bankruptcy jurisdiction counterclaims of the estate that would otherwise require a jury trial. The rationale for this rule is that the need to determine a creditor's claim fully makes resolving the trustee's counterclaim "integral to the restructuring of the debtor-creditor relationship" and so within the bankruptcy court's jurisdiction. *Id.* at 44, 111 S.Ct. 330.

Under these principles, the assertion of a claim against an estate in bankruptcy is sufficient to bring that claim within the bankruptcy jurisdiction, regardless of whether a right to jury trial would attach to the claim outside of bankruptcy and regardless of the nature of the claim— whether it arises under federal or state law, and whether it involves a breach of contract, a personal injury tort, or a property damage tort. As a matter central to the bankruptcy process, the Dorazios' claim against United is one that Congress could have placed within the jurisdiction of a non-Article III bankruptcy judge in accord with the Constitution. The Dorazios question, however, whether Congress has actually conferred this jurisdiction.

B. *Statutory grant of bankruptcy jurisdiction over claims against an estate.* Under the current jurisdictional system, enacted in response to *Marathon,* jurisdiction over bankruptcy cases is given in the first instance to federal district courts. 28 U.S.C. § 1334(a). However, pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district.[4] When presiding over a referred case, a bankruptcy judge has jurisdiction of two different types. First, as to "core" proceedings within the case, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b) to enter final orders and judgments. Second, as to non-core proceedings that are "related to" the bankruptcy case, a bankruptcy judge has a more limited jurisdiction under 28 U.S.C. § 157(c)—unless all of the parties to the proceeding consent to the bankruptcy judge entering a final order or judgment, the judge must submit proposed findings of fact and conclusions of law to the district court for that court's entry of a final order or judgment after de novo review.

■ 1. *Core jurisdiction under § 157(b)(2)(B); the personal injury exception.* Consistent with the constitutional limits of bankruptcy jurisdiction discussed above, Congress included within the bankruptcy court's core jurisdiction "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B). However, this statutory grant of jurisdiction to adjudicate claims is subject to an exception for "the liquidation or estimation of . . . unliquidated personal injury tort or wrongful death claims against the estate."[5] Be-

---

4. By Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of all bankruptcy cases in this district.

5. Section 157(b)(2)(B) states:

(2) Core proceedings include, but are not limited to—
  (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11. . . .

This language retains within core jurisdiction the "estimation" of personal injury tort claims for purposes of plan confirmation. Here, the debtors' objection seeks disallowance of the Dorazios' claim for all purposes and so this retention of jurisdiction does not come into play.

cause the statute does not define "liquidation" and "estimation," it is possible to argue that the debtors' objection seeks to "liquidate or estimate" the Dorazios' claim, and so is excluded from core bankruptcy jurisdiction by the personal injury exception in § 157(b)(2)(B).

The Seventh Circuit has not ruled on this question. The Dorazios cite *Pettibone Corp. v. Easley,* 935 F.2d 120 (7th Cir. 1991) as controlling authority, but *Pettibone* addressed a quite different jurisdictional issue. In *Pettibone,* a number of personal injury cases against the debtors were filed in nonbankruptcy forums while the debtors' Chapter 11 case was pending, thus violating the automatic stay imposed by § 362(a) of the Bankruptcy Code. The debtors' confirmed Chapter 11 plan "authorized the continued prosecution of these cases." *Id.* at 121. After the plan was confirmed, the debtors asked the bankruptcy court, rather than the courts hearing the personal injury cases, to decide whether these cases were subject to statute of limitations defenses because they were filed in violation of the stay. The Seventh Circuit simply held that after allowing the cases to proceed in other courts through the confirmed plan, the bankruptcy court had no jurisdiction to rule on the limitations defenses:

> Once the [bankruptcy] judge authorized the prosecution of the personal injury actions ... all that remained was a debate about the consequences of filing the tort action while the stay was outstanding. Disputes about the effect of a decision in one case on the prosecution of another are for the judge presiding in the second case.

*Id.* *Pettibone* did not address bankruptcy court jurisdiction over personal injury claims that have not been allowed by the bankruptcy judge to proceed in other fo-

rums, and in particular, it gave no consideration to the scope of the personal injury exception of § 157(b)(2)(B).

Courts that have addressed this issue have developed two general approaches, giving the exception a broader or narrower scope depending on the meaning they attribute to "liquidation or estimation." *See U.S. Lines, Inc. v. U.S. Lines Reorganization Trust,* 262 B.R. 223, 233 & n. 6 (S.D.N.Y.2001) (collecting authorities).

Decisions interpreting the personal injury exception broadly start with the proposition that any disallowance of a personal injury claim is a "liquidation or estimation." For example, *In re Schepps Food Stores, Inc.,* 169 B.R. 374 (Bankr.S.D.Tex. 1994), in holding that the exception prevented the bankruptcy court from considering a statute of limitations defense to a personal injury claim, equated denial of the claim on legal grounds with liquidation:

> [T]he effect of a decision on the limitations issues is undeniable; it would be a final adjudication of the merits of [the personal injury claimant's] state cause of action. . . . [To] disallow [the] claim based on a state statute of limitations defense ... would effectively liquidate the claim for purposes of distribution.

*Id.* at 377.

In contrast to this broad view of the personal injury exception, the court in *In re Dow Corning Corp.,* 215 B.R. 346, (Bankr.E.D.Mich.1997), like others reading the exception more narrowly, interpreted "liquidation or estimation" as involving only a determination of the amount of a claim, and thus found that it had jurisdiction to consider a summary judgment motion asserting that a personal injury claim against a bankruptcy estate was legally unenforceable:

"[L]iquidation" ... involves fixing the amount of a claim, but does not involve the determination of its validity. Hence, those aspects of the claims-allowance process of personal injury and wrongful death claims that are not part of the liquidation process are core proceedings that a bankruptcy court has the authority to hear and determine.

*Id.* at 359.

Several considerations indicate that the narrower reading of the personal injury exception is more appropriate.

■ First, even in interpreting a technically complex statute, courts are required to use the ordinary meaning of common terms, at least if that meaning does not produce absurd results.[6] The ordinary meanings of "liquidate" and "estimate," as applied to a disputed claim, involve determining the amount of the claim rather than its validity. Specifically:

● The most common definition of "liquidate" is "to determine by agreement or by litigation the precise amount of (indebtedness, damages, accounts)." *Webster's Third New International Dictionary* 1319 (1981).

● The most relevant definition of "estimate" is "to fix sometimes accurately, the size, extent, magnitude or nature of," as illustrated by the following example: "small and manageable numbers of birds must be counted precisely; huge flocks can only be estimated." *Id.* at 778.

An example may illustrate the impact of these ordinary meanings. Consider a personal injury plaintiff who asserts her claim against two individuals, one of whom is a debtor in bankruptcy. If the plaintiff fails to file a timely proof of claim in the debtor defendant's bankruptcy case, she may be found to have no right to payment under § 502(b)(9) of the Bankruptcy Code, but the *value* of her claim would not have been determined—and the other defendant could not accurately say that the claim had been "valued at zero." In this situation, the personal injury claim would be disallowed in the bankruptcy case, but it would not, in the ordinary sense of the words, be "liquidated" or "estimated." *Cf. Midway Motor Lodge v. Innkeepers' Telemanagement & Equipment Corp.*, 54 F.3d 406, 408–09 (7th Cir.1995) ("[I]t is not inconsistent for a judge to say: 'I want to determine whether a claim is tenable and, if it is, to estimate its value.'")

Second, the Bankruptcy Code itself distinguishes between determining the value of a claim and disallowing the claim as a matter of law. Section 502(b) requires a court, in resolving a claim objection, to determine the amount of the claim and allow the claim in that amount, "except to the extent" that the claim falls within specified categories of legal invalidity, including that the claim is unenforceable under applicable law (§ 502(b)(1)) and that no timely proof of the claim was filed (§ 502(b)(9)). There is no valuation of legally invalid claims. Moreover, as the *Dow Corning* decision exhaustively demonstrates, the Code has consistently been

---

**6.** *See Chapman v. United States,* 500 U.S. 453, 461–62, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) ("Neither the [Anti–Drug Abuse Act of 1986] nor the Sentencing Guidelines define the terms 'mixture' and 'substance,' nor do they have any established common-law meaning. Those terms, therefore, must be given their ordinary meaning."); *Commissioner v. Brown,* 380 U.S. 563, 570–571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (the term "sale" used in the Internal Revenue Code "without limiting definition and without legislative history indicating a contrary result" should be given "its common and ordinary meaning" unless that meaning "would lead to absurd results ... or would thwart the obvious purpose of the statute") (internal quotations and citations omitted).

interpreted as using the terms "liquidated" and "unliquidated" to distinguish claims whose amount is either fixed or readily ascertainable from claims whose amount is in genuine dispute, without regard to the validity of the claim. *Dow Corning*, 215 B.R. at 355–59. For example, *In re Knight*, 55 F.3d 231, 235 (7th Cir.1995), interprets the term "liquidated debt" in § 109(e) of the Code (defining eligibility limitations for Chapter 13 debtors) by quoting the explanation given in 1 William I. Norton, Jr., *Bankruptcy Law & Practice* § 18:12 at 18–48 (2d ed. 1994): "If the amount of a claim has been ascertained or can readily be calculated, it is liquidated—whether contested or not." Again, liquidation involves the valuation of a claim, not its validity.

■ Third, interpreting the personal injury exception narrowly—as removing from bankruptcy court jurisdiction disputes over the valuation of claims against the estate but not disputes over their legal validity—is consistent with related jurisdictional provisions of Title 28. Section 157(b)(5) requires the district court to "order that personal injury tort and wrongful death claims shall be tried in the district court." By directing that the order of transfer come from the district court, this section effectively allows a personal injury claim to remain subject to bankruptcy court jurisdiction until a party seeks withdrawal of the reference from the district court. And even then, it requires transfer of a claim objection only for trial. Both of these aspects of the provision allow for *pretrial* consideration of personal injury tort claims by the bankruptcy court, including a determination that such a claim is legally unenforceable.[7] Similarly, the narrower interpretation of the personal injury exception is consistent with 28 U.S.C. § 1411(a), which preserves the right to jury trial for personal injury and wrongful death tort claims, since no jury trial right would attach to a claim disallowed on purely legal grounds.

Fourth, far from producing any absurdity, the narrower interpretation of the personal injury exception advances the efficient resolution of claims and avoids placing unnecessary bankruptcy burdens on the district court. Even the *Schepps* decision, which adopted the broad view of the personal injury exception, noted the desirability of bankruptcy court involvement in the pretrial administration of personal injury claims. 169 B.R. at 378 n. 5 ("[T]he absence of bankruptcy court intervention and implementation of mediation, permissive abstention, or remand … would saddle our district judges with hundreds, if not thousands, of additional civil jury trials.").[8]

7. *Pettibone*, 935 F.2d at 123, mentions § 157(b)(5) in the following statement:

Congress required bankruptcy judges to transfer personal injury claims to district judges, as Pettibone's plan of reorganization did. 28 U.S.C. § 157(b)(5). Bankruptcy judges cannot try selected defenses in these tort cases—as Pettibone asked the bankruptcy judge to do with its limitations defenses—on the authority of § 157(c)(1). The whole case, including defenses of all kinds, goes off to the district judge or the state court.

This comment appears simply to reinforce the holding of the decision that, having allowed tort claims to proceed before other tribunals, the bankruptcy court could no longer pass on defenses to those claims. To the extent that the comment might be read as enunciating a rule that bankruptcy courts may not exercise any pretrial jurisdiction over personal injury tort claims, the statement would be dicta, since that issue was not presented by the case or briefed by the parties, and it would not follow from the language of § 157(b)(5).

8. It is the practice of the District Court for the Northern District of Illinois to allow personal injury tort claims to remain before the bankruptcy court until and unless a trial is required. *See In re Dreis & Krump Mfg. Co.,*

Finally, the legislative history of the personal injury jurisdictional provisions does not indicate that they were intended to limit bankruptcy court jurisdiction over personal injury claims beyond removing the trial of those claims to the district court. The provisions were all enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA). The conference report on this bill merely sets forth its text, with no explanatory material. *See* H.R.Rep. No. 98–882 (1984).

The only interpretive legislative history for BAFJA is a set of brief floor statements by members of the conference committee. Such statements are not authoritative. *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Moreover, none of the statements discussed whether the personal injury exception of § 157(b)(2)(B) would remove consideration of purely legal claim objections from core bankruptcy jurisdiction.[9] Rep.

1995 WL 41416 at *3 (N.D.Ill.1995) (dealing with a request by a personal injury claimant to withdraw the reference of her claim from the bankruptcy court):

> The Court has great confidence in the bankruptcy court's ability to administer this proceeding to the limits of its constitutional authority. Because Bankruptcy Courts in the Seventh Circuit lack the authority to conduct jury trials, *In re Grabill Corp.*, 967 F.2d 1152 (7th Cir.1992), and because [the moving creditor], as a personal injury claimant, has a right to a jury trial, 28 U.S.C. § 1411, this Court will withdraw the reference at the time this case is ready to go to trial, if the proceedings reach that point.

9. The only relevant statements are the following:

(1) Sen. Thurmond briefly paraphrased the language of §§ 157(b)(2)(B) and 1411, adding no explanation. 130 Cong. Rec. 20081 (1984).

(2) Sen. Dole described the distinction in roles between bankruptcy and district court under the core/non-core system established by BAFJA, and then stated: "One of those areas reserved for attention of the district courts will be personal injury claims, which are exempted from the definition of core proceeding under the bill." *Id.* at 20083.

(3) Rep. Fish summarized the provisions of § 157(b)(5), stating that "[a] personal injury or wrongful death tort claim against a bankruptcy estate can be tried in a Federal district court with a jury," and noting that the district court in which the bankruptcy case was pending would decide the venue for such a trial. *Id.* at 20226.

(4) Rep. Kastenmeier emphasized that the conferees had rejected a Senate proposal that bankruptcy judges not be allowed to "hear unliquidated claims," *id.* at 20227, and then

explained the exception to bankruptcy court jurisdiction for personal injury claims as defining where the claim would be tried or "heard":

> The conference report ... states that a narrow category of cases are not to be construed as core proceedings. Thus, personal injury cases and wrongful death cases may not be heard to final judgment by a bankruptcy judge. These cases are to be transferred to the district court judge. Of course, under the provisions of section 157(c)(2), such proceedings may be handled by a bankruptcy judge as long as that judge does not enter a final judgment. In addition, a bankruptcy judge may hear such cases with the consent of all of the parties. Thus, in those rare cases where the parties insist, a personal injury or wrongful death case may be tried to judgment by a district court judge. Finally, the conference report states that in this narrow range of cases the parties do not lose any right to a jury trial that they may have had if the claim had been cognizable outside the bankruptcy context.

*Id.* at 20228 (footnote omitted).

(5) Rep. Kindness appears to have interpreted the personal injury exception as allowing estimation of these claims for purposes of distribution of an estate:

> The estimation of contingent or unliquidated claims in order to allow or provide for the distribution of an estate would, of course, be a core proceeding. I think it was intended, certainly by the conferees, that the estimation function, and thus the proceeding with the distribution, would not be interfered with by the change that was wrought to deal with the personal injury court actions and wrongful death actions.

*Id.* at 20229.

Kastenmeier's statement that a personal injury claim "may not be heard to final judgment by a bankruptcy judge" may well have referred to final judgment after trial, since he explained the right accorded personal injury claimants as follows: "[I]n those rare cases where the parties insist, a personal injury or wrongful death case may be tried to judgment by a district court judge." 130 Cong. Rec. 20228 (1984). In any event, another member of the conference committee, Rep. Kindness, apparently interpreted the personal injury exception as allowing bankruptcy judges core jurisdiction even over the estimation of claims for purposes of distributing an estate. *Id.* at 20229. These floor statements provide no basis for interpreting the "liquidation" or "estimation" contrary to their ordinary meaning.

■ Accordingly, an objection to the legal validity of a personal injury tort claim does not fall within the personal injury exception to the core bankruptcy jurisdiction conferred by § 157(b)(2)(B), and this court may enter a final order dealing with the debtors' pending objection to the Dorazios' claim.

■ *2. Non-core jurisdiction under § 157(c)(1).* Even if the broader interpretation of the personal injury exception were accepted—so that a claim objection challenging the legal validity of a personal injury claim were not within the core jurisdiction of a bankruptcy court—this court would nevertheless have non-core jurisdiction to consider the objection under § 157(c)(1), based on the objection being

"related to" the debtors' bankruptcy cases. A proceeding is "related to" a bankruptcy case if it "affects the amount of property available for distribution or the allocation of property among creditors." *In re Xonics, Inc.,* 813 F.2d 127, 131 (7th Cir.1987). The allowance or disallowance of the Dorazios' claim would plainly affect the allocation of property among creditors—directly to the Dorazios and the class they seek to represent, and indirectly to other general unsecured creditors (who would receive a smaller share of the property of the estate to the extent that the Dorazios claim is allowed). Thus, a bankruptcy court would have the authority to make a recommendation to the district court as to the legal validity of a personal injury claim even if it could not enter a final order. As noted above, § 157(b)(5), which requires the district court to order personal injury tort claims "tried in the district court," does not affect pretrial proceedings.

II. *The validity of the Dorazios' claim under the Warsaw Convention.*

■ The principal ground of the debtors' objection to the Dorazios' claim is that the claim is not based on an "accident" under the Warsaw Convention. The Warsaw Convention is a treaty governing various aspects of international air transportation, to which the United States is a signatory.[10] Under the Supremacy Clause, such treaties preempt conflicting local law. U.S. Const. art. VI, cl. 2.[11] One of the major effects of the Warsaw Convention is a limitation of liability for air carriers. Andreas F. Lowenfeld & Allan

**10.** The formal title of the treaty is The Convention for the Unification of Certain Rules Relating to International Transportation by Air. It was opened for signature on October 12, 1929, is reported at 49 Stat. 3000 and 137 L.N.T.S. 11, and is reprinted in 49 U.S.C.A. § 40105 (West 2004).

**11.** The Supremacy Clause provides in pertinent part that "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

I. Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv. L.Rev. 497, 499 (1967).

Whether the Dorazios assert an "accident" under the Warsaw Convention is essential to the validity of their claim because of liability limiting provisions of the Convention. First, Article 17 of the Convention allows recovery for personal injuries only if they arise from an "accident." *Air France v. Saks*, 470 U.S. 392, 397, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985); *Olympic Airways v. Husain*, —— U.S. ——, 124 S.Ct. 1221, 1227 n. 8, 157 L.Ed.2d 1146 (2004) ("[T]here can be no liability for passenger death or bodily injury under the Convention in the absence of an Article 17 'accident' . . . ."). Second, Article 24 of the Convention makes Article 17 liability the sole ground for personal injury recovery, preempting local law that might allow recovery for injuries not caused by an "accident." *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (accepting the government's position that the Convention "preclude[s] a passenger from asserting any air transit personal injury claims under local law, including claims that fail[ ] to satisfy Article 17's liability conditions . . . because the injury did not result from an 'accident' "). Accordingly, unless the Dorazios' claim was caused by an "accident" under Article 17, the claim is not enforceable.

■ The Supreme Court has twice examined the meaning of "accident" under Article 17. In *Saks*, 470 U.S. at 402, 105 S.Ct. 1338, the Court noted that the Warsaw Convention establishes one standard of liability for injury to persons (Article 17, requiring injury caused by an "accident") and another for injury to goods and baggage (Article 18, requiring only injury caused by an "occurrence"). This difference led the Court to determine that "an accident must mean something different than an 'occurrence' on the plane." *Id.* at 403, 105 S.Ct. 1338. After reviewing a number of decisions from courts of other signatories to the Convention, the Court concluded that "accident" under Article 17 is "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405, 105 S.Ct. 1338. Thus, in *Saks* itself, where the claimant asserted an ear injury arising from ordinary changes in air pressure during flight, the Court found that no recovery was possible: "[W]hen the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply." *Id.* at 406, 105 S.Ct. 1338.

The second decision, *Olympic Airways v. Husain*, —— U.S. ——, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004), involved the failure of an airline flight attendant to move an asthmatic passenger to a seat farther from the smoking section of an aircraft. 124 S.Ct. at 1224–25. The principal question addressed by this decision was whether failure to act could constitute an accident, and under the circumstances of this case, the Court held that it could:

> The distinction between action and inaction . . . would perhaps be relevant were this a tort law negligence case. But [plaintiffs] do not advocate, and [the defendant airline] vigorously rejects, that a negligence regime applies under Article 17 of the Convention. The relevant "accident" inquiry under *Saks* is whether there is "an unexpected or unusual *event or happening*." [470 U.S. at 405, 105 S.Ct. 1338] (emphasis added). The rejection of an explicit request for assistance would be an "event" or "happening" under the ordinary and usual definitions of these terms.

*Id.*, 124 S.Ct. at 1228–29. The district court that heard the case found that the flight attendant's refusal to reseat the plaintiff was not expected or usual; the Ninth Circuit agreed. *Id.*, 124 S.Ct. at 1225. The airline did not challenge the finding, and accordingly, the Supreme Court expressly declined to review it. *Id.*, 124 S.Ct. at 1227. Because the flight attendant's failure to act was "an event" that could constitute an accident, and because that event was "unexpected and unusual"—"the operative language under *Saks* and the correct Article 17 analysis"—judgment in favor of the plaintiff was affirmed. *Id.*, 124 S.Ct. at 1230.

Here, the event that the Dorazios assert to be an "accident" is the disinsection of the aircraft in which they flew from Australia to the United States. They do not contend that this disinsection was unusual; to the contrary, the Dorazios allege that the disinsection of such flights was the normal practice of United—and indeed, as noted above, it was United's legal obligation. Instead, the Dorazios argue that the disinsection was an accident because it was "unexpected":

> [W]hen [the Dorazios] and the other passengers they seek to represent sat in their seats, they had no reason to "expect" that it and other surfaces had been coated with toxic substances that they would absorb or inhale (and certainly no reason to expect that a flight attendant would spray some in the cabin while in flight.) Had the passengers been warned prior to boarding about the disinsecttion procedures and the toxicity of the chemicals used, then they could have expected to have inhaled or absorbed such chemicals and no "accident" would have occurred; but in the absence of such warning, the movement of the chemicals from the seat or surfaces or aerosol can into their skin, nasal passages, or lungs was as much of an unex-

pected, external event as the movement of the surrounding surface of the plane into their bodies in a crash would have been.

Response to Debtors' Objection to Dorazio Claim, Ex. B., at 4.

The question raised by this argument is whether an ordinary and usual aspect of air travel can constitute an "accident" because a passenger, not having been warned about it, may not expect it to occur. The Supreme Court did not directly address this question in either *Saks* or *Husain,* but the Court's treatment of "accident" in those decisions, as well as the reasoning of other courts dealing with claims similar to the present one, indicates that the routine disinsection alleged by the Dorazios was not an "accident" under Article 17 of the Warsaw Convention.

In both *Saks* and *Husain,* the Supreme Court contrasted the "unexpected or unusual event" that would be an Article 17 accident with the normal operation of an aircraft. Thus, in the course of giving "considerable weight" to the "opinions of our sister signatories," *Saks* quoted a French court's observation that "the term 'accident' in Article 17 of the Warsaw Convention embraces causes of action that are fortuitous or unpredictable." *Saks,* 470 U.S. at 404, 105 S.Ct. 1338. The decision continues:

> European legal scholars have generally construed the word "accident" in Article 17 to require that the passenger's injury be caused by a sudden or unexpected event other than the normal operation of the plane. *See, e.g.,* O. Riese & J. Lacour, *Précis de Droit Aérien* 264 (1951) (noting that Swiss and German law require that the damage be caused by an accident, and arguing that an accident should be construed as an event which is

sudden and independent of the will of the carrier). . . .

*Id.* Similarly, *Husain* repeatedly emphasized the lower courts' findings that the flight attendant's failure to act was in "blatant disregard of industry standards and airline policies" and that her behavior was unexpected and unusual "in light of" these standards and policies. *Husain*, 124 S.Ct. at 1225, 1227.

Indeed, there appear to be no reported decisions finding liability under Article 17 of the Warsaw Convention arising from the usual and ordinary operation of an aircraft. And while disinsection may raise a question of first impression in this regard, a large group of decisions dealing with a similar claim—deep vein thrombosis (or DVT)—has uniformly declined to find Article 17 accidents in the absence of an airline's deviation from ordinary operating standards.

Like the Dorazios' claim here, the claims in the DVT decisions involved an asserted duty to warn. The plaintiffs alleged that they developed DVT (a potentially life-threatening formation of blood clots in major veins) due to prolonged air travel in cramped seating, and that they could have avoided this injury if they had received proper warnings. See Tory Weigand, "Deep Venous Thrombosis and Airline Travel" in *Conning the IADC Newsletters*, 69 Def. Couns. J. 517, 523–30 (2002) (describing the medical condition and litigation theories). In major test cases in the United Kingdom and Australia, the courts have held that a failure by airlines to warn of a danger of DVT could not constitute an Article 17 accident. *See Deep Vein Thrombosis and Air Travel Group Litigation*, [2003] EWCA Civ. 1005, 2003 WL 21353471, *650 (July 3, 2003); *Qantas Ltd. v. Povey*, [2003] VSCA 227, ¶ 17, 2003 WL 23000692, ¶ 17 (Dec. 23, 2003).[12] An unreported decision of the Ontario Court of Justice, *McDonald v. Korean Air*, 2002 WL 1861837 (Sept. 18, 2002), reached the same result.[13] In this country, two reported decisions agree that developing DVT in a flight conducted in accord with ordinary airline standards is not an accident. *Rodriguez v. Ansett Australia Ltd.*, 2002 WL 32153953 (C.D.Cal.2002); *Louie v. British Airways, Ltd.*, 2003 WL 22769110 at *10 (D.Alaska 2003) (finding the British court's reasoning on the issue to be persuasive).

Two other decisions of U.S. courts have permitted adjudication of claims for failure to warn of DVT on long flights—but only because the plaintiffs alleged that it was industry practice to give such warnings during flight. *Miller v. Continental Airlines, Inc.*, 2003 WL 21557678 at *3, *5 (N.D.Cal.2003) (distinguishing foreign decisions because they assumed "that it is not customary procedure to inform passengers of the risk of DVT" and because plaintiffs alleged that it is "customary procedure . . . to 'warn passengers of the risks [of contracting DVT during lengthy flights] and to warn or advise of the simple steps the passengers could take to minimize those [DVT] risks'"); *Blansett v.*

---

**12.** These decisions were cited by the Supreme Court in *Husain*, 124 S.Ct. at 1229 n. 9, with the acknowledgement that although their reasoning might have been different from that employed in *Husain*, their conclusions, due to the factual differences between the cases, were "not inconsistent" with that of *Husain*.

**13.** As described in Gerard R. Mullins, *The Air Travel Deep Vein Thrombosis (DVT) Litigation*, 2 Ann.2003 ATLA–CLE 2117 (2003), the court rejected a plaintiff's claim that failure to warn of DVT was actionable under the Warsaw Convention even if that failure was negligent, holding that "negligence was not itself an accident within the meaning of Article 17 in the sense that the DVT sustained by the plaintiff was not linked to an unusual and unexpected event external to him as a passenger."

*Continental Airlines,* 246 F.Supp.2d 596, 602 (S.D.Tex.2002) (holding a jury could find that "failure to warn passengers ... of the risk of DVT was an unexpected and unreasonable deviation from routine industry procedure, and thus, an accident under the Warsaw Convention"). In sum, the only decisions to find an "accident" based on a duty to warn about DVT involve allegations that the failure violated industry standards for conducting a flight.

The Dorazios' claim alleges no failure by United to comply with industry standards at any time, and the failure to warn of disinsection that is involved in the Dorazios' claim did not occur during the flight itself. Rather, the Dorazios assert that United should have warned them—before the flight took place—of a normal procedure involved in the flight, so that they could have chosen not to fly. In this way, the Dorazios have gone far beyond the understanding of "accident" set out in *Saks* and *Husain*—asserting an injury caused by the ordinary, required operations of a flight because they had not been advised of those operations. This is not an "accident" under the Warsaw Convention, and because the Convention precludes any alternative recovery under local law, the Dorazios' claim must be disallowed.[14]

## Conclusion

For the reasons set out above, the debtors' objection is sustained and the Dorazios claim will be disallowed. A separate order will be entered to that effect.[15]

14. The debtors assert several other grounds for disallowing all or part of the Dorazios' claim. In light of the conclusion reached regarding the application of Article 17 of the Warsaw Convention, these other grounds need not be addressed.

15. In the event that this court is found to lack core jurisdiction over the debtors' claim objection, this opinion will serve as recommended findings and conclusions for consideration by the district court.