**Hamadia AZIZ; Cawa Aziz; Nabaz Aziz; Neyaz Aziz; and Scalla Aziz, Plaintiffs,**

v.

**AIR INDIA LIMITED, dba Air India, Defendant.**

**Case No. EDCV–08–838–SGL (PLAx).**

United States District Court, C.D. California.

Oct. 1, 2009.

James Thomas Bentson, James T. Bentson Law Offices, San Diego, CA, for Plaintiffs.

Frank A. Silane, Richard A. Lazenby, Condon and Forsyth, Los Angeles, CA, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

STEPHEN G. LARSON, District Judge.

This case involves the tragic story of a passenger suffering cardiac arrest onboard a lengthy international flight and later being pronounced dead by paramedics at the arrival gate. The question before the Court is whether the airline's failure to have onboard an automated external defibrillator ("AED") renders it liable for the passenger's death under international law, as established by treaty. For the reasons set forth below, the Court holds that, under the law governing this case, the aircraft is not required to have such a device in place and, therefore, awards summary judgment in favor of the airline.

### I. *Undisputed Facts*

Air India Limited, d/b/a Air India ("Air India"), is a foreign air carrier, organized under the laws of and with its principal place of business in India, that operates aircraft in the United States pursuant to a certificate issued under Part 129 of the Federal Aviation Regulations.

On June 27, 2007, Ramazan Aziz was a passenger on board Air India Flight 137 from Frankfurt, Germany, to Los Angeles, California, traveling on a round-trip ticket on Air India originating in Los Angeles.

After landing at Los Angeles International Airport, and while the airplane was still in the process of taxiing to the gate, a passenger seated next to Aziz noticed that he had collapsed and was not breathing. The passenger called the flight attendant and alerted her to Aziz's condition. Another passenger seated nearby reported to the flight attendant that, an hour earlier, she had spoken to Aziz, and that after that conversation the passenger presumed Aziz had fallen asleep.

Air India's procedures for assisting medically ill passengers are as follows: (1) The In–Flight Supervisor ("IFS") shall be informed; (2) a suitable announcement shall be made requesting the help of a qualified medical practitioner; (3) the cabin crew shall render every assistance to the doctor treating the sick passenger by ensuring that the doctor has privacy to conduct the examination and that a bed is prepared if necessary; (4) the IFS or Flight Purser shall indicate in the flight report the doctor's name, address, registration number, seat number, and the sector on which assistance was sought; (5) if a doctor is not available on board and the passenger's condition appears serious, the IFS shall inform the Commander so that a message

can be sent for a doctor to meet the flight at the next port of call; and (6) the Commander shall be informed in all cases where the passenger's illness appears serious.

When Air India Flight 137's flight crew was alerted to Aziz's condition, the flight attendant immediately summoned an onboard doctor, a passenger who identified himself as Dr. Gautam Mittal, and then notified the IFS and the plane's captain. Dr. Mittal examined Aziz and took his vital signs. Dr. Mittal found that Aziz was not breathing, did not have a pulse, and was very pale. As Dr. Mittal was treating Aziz, the flight crew contacted the airport for paramedics and requested that they respond to the aircraft at the arrival gate.

The flight crew initially provided Dr. Mittal with a stethoscope and a blood pressure apparatus. Later, a flight attendant also brought him an oxygen mask and tank. Dr. Mittal had another passenger standing nearby administer oxygen to Aziz while the doctor performed CPR on Aziz. At no time did Dr. Mittal ask the flight crew for a defibrillator or any other equipment or medicine.

Paramedics boarded the aircraft after it arrived at the gate fifteen minutes later and the door was opened. Upon entering the aircraft the paramedics spotted Aziz lying in his seat, (and for reasons never explained) unattended and with no medical services being provided by anyone. Although the paramedics found that Aziz was not breathing and had no pulse, they noted that he was not yet asystolic (no heart contractions) and their EKG monitor initially showed that he did emulate ventricular fibrillation (V-fib) waves. The paramedics attempted CPR and employed an AED to administer a defibrillation shock on Aziz. Thereafter, the monitor showed that Aziz became asystolic. Epinephrine and Atrophine were administered intravenously at which point Aziz's heart temporarily resumed ventricular fibrillation waves on the monitor. Continuing attempts to revive Aziz's heart were unsuccessful and Aziz thereafter remained asystolic. Aziz was pronounced dead on board the airplane at 5:45 p.m. No autopsy of Aziz's body was performed.

Aziz's wife and his four children eventually filed suit against Air India alleging a state law tort claim of wrongful death based on the contention that, if the aircraft was equipped with an AED, Aziz would have survived.

## II. Analysis

■ Neither party disputes that the Convention for the Unification of Certain Rules for International Carriage by Air adopted at Montreal, Canada, on May 28, 1999 ("Montreal Convention"), see S. Treaty Doc. No. 106–45 (adopting and ratifying the Montreal Convention on November 4, 2003), applies to the allegations leveled by the Aziz family, and thereby preempts their state common law wrongful death claim.[1] Aziz's round-trip international flight unquestionably constitutes "international carriage" as that phrase is defined in the Montreal Convention, and therefore "any action for damages" arising from such a "carriage of passengers[,] ... however founded, whether ... in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in" the convention. Montreal Convention, art. 29; see also El Al Israel Airlines, Ltd. v. Tseng, 525 U.S.

1. The Montreal Convention is the successor treaty to the 1929 Warsaw Convention, and unifies and replaces the system of liability that derived from the Warsaw Convention. Because many of the provisions between the two conventions are similar, courts have often looked to the large body of established Warsaw Convention jurisprudence for guidance when interpreting the provisions of the Montreal Convention.

155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("recovery for a personal injury suffered on board an aircraft or in the course of embarking or disembarking, if not allowed under the Convention, is not available at all").

The question, then, is whether the Aziz family can establish a viable claim against Air India under the framework set forth in the Montreal Convention.

The circumstances under which an airline carrier may be liable for injury to a passenger during an international flight are set forth in Article 17 of the Montreal Convention:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

■ The United States Supreme Court has interpreted this treaty language as requiring that, for a passenger to hold an airline carrier liable for any injury he or she sustains, the passenger must establish that (1) there has been an "accident," (2) that caused the passenger's injury, and (3) that said accident occurred while on board the aircraft or in the course of embarking or disembarking the aircraft. *See Eastern Airlines v. Floyd*, 499 U.S. 530, 535–36, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). Here, the parties' spar over whether an "accident" occurred and, if it did, whether such an accident "caused" Aziz's death.

■ Nowhere does the convention define the term "accident," but the United States Supreme Court later supplied meaning to the term (as it was used in the predecessor to the present convention— the Warsaw Convention) in the case of *Air France v. Saks*, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). There, the court held that "accident" means "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405, 105 S.Ct. 1338. As explained by the court, although "this definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries," *id.*, at its core, "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id.* at 405–06, 105 S.Ct. 1338. Questions of negligence are not implicated or even relevant; instead the focus of the inquiry is on "the nature of the event which caused the injury rather than the care taken by the airline to avert the injury." *Id.* at 407, 105 S.Ct. 1338. Thus, for there to have been an "accident", the Aziz family must show that the asserted act or omission was unexpected or an unusual event, that was external to Aziz, and that actually caused his death. *See Caman v. Continental Airlines, Inc.*, 455 F.3d 1087, 1089 (9th Cir. 2006).

### A. Whether the Occurrence was "External" to the Passenger

■ Air India takes the position that, because Aziz's heart attack was nothing more than his own "internal" reaction to an otherwise uneventful, routine flight (as opposed to being something "external" to him), it cannot form the basis for an "accident" under the Montreal Convention. The airline reads the Aziz family's complaint too narrowly. Their complaint is *not* with simply their husband and father suffering a medical emergency while onboard the aircraft; instead their complaint is directed at the airline's failure to stock a particular medical device on the plane, characterizing that failure as the "event" which was the "unusual or unexpected" occurrence that "caused" his death. No serious argument can be advanced that the

airline's decision on whether to stock its aircraft with AEDs was something external to Aziz.

The Supreme Court has held that a flight attendant's repeated refusal to honor a request to reseat a passenger who was severely allergic to tobacco smoke further away from the plane's smoking section was external to the passenger, *see Olympic Airways v. Husain*, 540 U.S. 644, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004); in much the same way an airline's decision on what medical equipment to place onboard its aircraft is external to the passenger. *See Fulop v. Malev Hungarian Airlines*, 175 F.Supp.2d 651, 663 (S.D.N.Y.2001) ("the unusual or unexpected event or happening that occurred here which caused the accident was not Fulop's heart attack, or his internal reaction to the normal operation of the aircraft. Rather, it may be viewed as the alleged aberrant conduct of Malev's employees in handling the occurrence, the failures of which aggravated Fulop's initial heart attack"). Indeed, in nearly all the cases cited to by Air India in support of its legal proposition regarding externality, the courts have simply held that the fact of a passenger suffering a heart attack or some other physical ailment, *by itself*, was not an "external" occurrence under the convention. *See Fischer v. Northwest Airlines, Inc.*, 623 F.Supp. 1064 (N.D.Ill.1985); *Rajcooar v. Air India Ltd.*, 89 F.Supp.2d 324, 328 (E.D.N.Y.2000); *see also Caman*, 455 F.3d at 1089 ("development of DVT [deep vein thrombosis] itself does not constitute an Article 17 'accident'" as it is "nothing more than a passenger's own internal reaction to the usual, normal, and expected operation of the aircraft"). Here, however, the Aziz family is arguing that there was something more that caused his death separate and apart from the heart attack itself, namely, Air India's failure to stock an AED on its aircraft. That something else was "external" to Aziz and thus could qualify as an "accident" under the Montreal Convention depending upon whether the other requirements are met.

B. *Whether the Failure to have an AED onboard the airplane was an "Event"*

With respect to the failure to have an AED onboard, Air India argues that such an omission was not an "event" as defined in the Montreal Convention.

The Supreme Court supplied meaning to the term "event" in the case involving the asthmatic passenger seated next to the aircraft's smoking section. *See Husain*, 540 U.S. 644, 124 S.Ct. 1221. There, as noted above, the passenger was seated near the plane's designated smoking section. Because the passenger had a history of allergic reactions to tobacco smoke, he asked a flight attendant on numerous occasions to be moved away from the smoking section; the attendant repeatedly refused his requests. The passenger later died onboard the plane in an apparent reaction to the tobacco smoke. The Supreme Court concluded that, despite the fact that the airline's conduct (by way of the flight attendant) was due to inaction, it nonetheless could be considered an "event" because "the rejection of an explicit request for assistance [is] an 'event' or 'happening' under the ordinary and usual definitions of these terms." *Id.* at 655, 124 S.Ct. 1221.

█ The Ninth Circuit fleshed out the parameters of when inaction constitutes an "event" in *Caman v. Continental Airlines, Inc.*, 455 F.3d 1087 (9th Cir.2006), a case involving an airline's failure to warn passengers about the dangers of developing deep vein thrombosis ("DVT") on long flights. There the Ninth Circuit held that inaction will only constitute an "event" for purposes of the Montreal Convention when it is an act of *commission* as opposed to one of *omission*. As explained by the court: "Continental's failure to warn

[about DVT] was an act of *omission* (inaction that idly allows an unfolding series of events to reach their natural conclusion) as opposed to an act of *commission* (inaction that produces an effect, result or consequence) as in *Husain*'s rejection of a direct plea for help."[2] *Id.* at 1092.

A later Ninth Circuit case similarly limited the class of "events" due to inaction to those very categories noted in *Caman*— refusals to abide by passenger requests or to comply with mandatory regulatory requirements. In *Twardowski v. American Airlines,* 535 F.3d 952 (9th Cir.2008), the court expressly rejected the notion that failure to heed governmental or other regulatory bodies "requests" for airlines to perform a certain task (in that case, provide warnings to passengers about the dangers of developing DVT while in-flight) constituted an "event." *Id.* at 960 ("It does not become [an event] simply because public agencies have recommended or 'requested' warnings"). In so holding, *Twardowski* expressly distinguished inaction to public agency "requests" from inaction to public agency "requirements" or from inaction in the face of "specific health-based requests for help" from a passenger.[3] *Id.* In doing so, however, the Ninth Circuit expressly left open the question of whether compliance (or failure to do so) with industry standards or the airline's own internal policies could figure into whether an air-

line's inaction constituted an "event." *Id.* at 961 ("Just as we found it unnecessary to decide how industry standards figure into the Article 17 analysis in *Caman,* it is unnecessary to do so here .... we need not (and do not) decide what effect, if any, an airline's violation of its own policies would have on liability under Article 17").

On this basis, Air India makes the argument that, without a specific plea made to flight attendants for an AED by the onboard doctor, any inaction on its or the flight crew's part (or in this case, the affirmative decision not to stock the plane with said AED) was simply an act of omission for which no liability may attach. In Air India's view, only a failure to act in the face of either explicit requests by the passenger (or a doctor in his or her stead if the passenger is unconscious), or regulatory *requirements* to provide certain aid or provisions, can constitute an "event" for which it can be held liable. (Def's Mot. Summ. J. at 15 (absent *"explicit* requests [or] requirements under ... Air India's procedures or the law," there can be "no 'event' ")). Using this reading, Air India notes that no event occurred here, as the airline followed all of *its* own internal procedures and Dr. Mittal did not make a request for an AED during the incident in question on Flight 137.

Here, there is no dispute that Aziz did not make a "specific health based request"

---

2. This appears to this Court to collapse or conflate the inquiry as to whether an "event" occurred into the question of whether the occurrence was "unusual or unexpected" (namely, whether the airline was required by statute or regulation to provide said action or requested to do so directly by the passenger), but such is the law of this circuit. *See Blansett v. Continental Airlines, Inc.,* 379 F.3d 177, 181 n. 4 (5th Cir.2004) (noting that Judge Dennis disagreed with making distinctions "between different types of inaction" as the "potential ramifications" of such a distinction were "not clear").

3. The Ninth Circuit distinguished public agency "requests" for action from those made by passengers upon the rationale that the latter case involved a specific request, related to a particularized and presently occurring health emergency. *Id.* ("Generalized requests by public agencies to warn are quite different from the particularized requests by individual passengers for assistance, and the airline's response to them"). That a failure to heed the public agency "request" may not surprisingly lead to the urgent need for the "passenger request", when it is much too late to effectively respond, does not appear to factor into this analysis.

for an AED; a result that is not surprising given that he was comatose and suffering from a heart attack at the time. Nor did the physician who treated him onboard the plane, Dr. Mittal, make such a request. However, in a later interview with private investigators, Dr. Mittal downplayed the significance of his failure to ask for an AED, explaining that "his whole attention was on the cardiac massage and CPR efforts," not making requests for particular items of medical equipment. (Decl. James Bentson, Ex. D at 9). Indeed, from the interview with Dr. Mittal, it appears that at no point did he make a request for *any* of the medical equipment that was onboard the airplane and that he did in fact use to treat Aziz; instead, flight attendants simply brought, unsolicited, such equipment to him. (*Id.* at 8 ("the air hostess brought Dr. Mittal a stethoscope …, Dr. Mittal recalled that he was also brought blood pressure apparatus …, [t]he air hostess brought him an oxygen mask and tank with an Ambu-bag" while Dr. Mittal was performing CPR)). Thus, it would appear that if an AED was onboard Flight 137 the flight attendant would have brought it to Dr. Mittal unsolicited. Nonetheless, the Court agrees that there is, in fact, no evidence of a request for an AED being made.

This then leaves the question as to whether having an AED onboard an international flight was either required by a public agency or was an industry standard at the time.

For its part, Air India labels the Aziz family's call for the provision of an AED onboard international flights as asking for the airline to do something more than what Dr. Mittal sought, and states that the Ninth Circuit in *Caman* rejected such a basis for liability. *Caman* did provide that

"[a]ttributing liability to an air carrier for failing to do all it can to prevent an injury that is inherent in air travel … improperly shifts the focus of the inquiry from the nature of the event which caused the injury to the alleged failure of the air carrier to avert the same." 455 F.3d at 1092. On that basis, Air India labels the Aziz family as seeking to impose liability on account of the "risk inherent in air travel" where there are "limited resources available to respond to medical emergencies." (Def's Mot. Summ. J. at 16). This contention, however, assumes that there was no legal requirement that airlines carry AEDs on board international flights or an industry standard for the same, an assumption to which the Court now turns.

The Aziz family points to FAA regulations which state that, "for treatment of injuries, medical events or minor accidents that might occur during flight time[,] each airplane must have the following equipment[:] … in airplanes for which a flight attendant is required and with a maximum payload capacity of more than 7,500 pounds, an approved automated external defibrillator as of April 12, 2004." 14 C.F.R. § 121.803. The Aziz family also note that the Office of the Director of Civil Aviation for the Indian government promulgated a regulation in 2002 that mirrors the requirements contained in the FAA regulation quoted above. Specifically, the Indian regulation provided that, effective April 12, 2004, "all scheduled airlines operating transport category aircraft capable of carrying more than 30 passengers including crew when engaged in commercial flights shall carry one approved automated external defibrillators to provide the option to treat any serious medical events during flight time." *See* Civil Aviation Requirements sect. 2, series "X", part III, subsection 6.2.[4]

4. The regulation cited was a revision of a similar provision the Indian government had

promulgated on June 12, 1997, requiring air

Air India responds by arguing that both regulations cited to by the Aziz family are irrelevant to *international* flights.

Insofar as the FAA regulation is concerned, Air India notes that the cited provisions only apply to *domestic* U.S. air carriers. A separate section to the FAA regulations contained in the Code of Federal Regulations—part 129 of Title 14 of the C.F.R. (as opposed to part 121 cited to by the Aziz family)—applies to *foreign* air carriers. Indeed, Air India operates aircraft in the United States pursuant to a certificate issued under part 129 of the Federal Aviation Regulations. Section 129.11 of part 129 of the regulations, in contrast, provides that "each foreign air carrier shall conduct its operations within the United States in accordance with operations specifications issued by the Administrator under this part and in accordance with the Standards and Recommended Practices contained in part I (International Commercial Air Transport) of Annex 6 (Operation of Aircraft) to the Convention on International Civil Aviation Organization ("ICAO")." 14 C.F.R. § 129.11. There are no operation specifications under part 129 (as opposed to those found in part 121 for domestic carriers) requiring foreign air carriers to equip their aircraft with AEDs. This the Aziz family does not contest.

■ Nor, at the time of the incident in question, Air India argues was there any requirement for onboard AEDs found in part I of Annex 6 to the ICAO. On this point, the Aziz family takes exception. They note that section 6.2.2 to Part I Annex 6 of the ICAO requires (using the word "shall") that airplanes be "equipped with a) accessible and adequate medical supplies appropriate to the number of passengers the aeroplane is authorized to carry" and recommends that such "medical

supplies" consist of "one or more first-aid kits, and a medical kit, for the use of medical doctors or other qualified persons in treating in-flight medical emergencies for aeroplanes authorized to carry more than 250 passengers." According to the Aziz family, such a requirement may have compelled that an AED be onboard an international flight "in order for [the] medical supplies onboard to be adequate." (Pls' Opp. at 5).

Air India responds that the same provision requiring "adequate medical supplies" also notes that "[g]uidance on the types, number, location and contents of the medical supplies is given in Attachment B," and then provides that attachment. An AED is not among the list of required medical supplies and equipment in Attachment B to the ICAO. Indeed, that attachment contains a specific statement regarding AEDs and their presence on international flights:

> 1.2 Based on the limited available evidence, only a very small number of passengers are likely to benefit from the carriage of ... AED on aeroplanes. However, many operators carry them because they offer the only effective treatment for cardiac fibrillation. The likelihood of use, and therefore of potential benefit to a passenger, is greatest in aircraft carrying a large number of passengers, over long duration sector lengths. The carriage of AEDs should be determined by operators on the basis of a risk assessment taking into account the particular needs of the operation.

(Decl. Richard Lazenby, Ex. A at 4). Although this statement would appear to strongly recommend that an AED be carried onboard a long flight such as that

carriers to have AEDs onboard effective February 15, 2001. (Decl. Dr. L.P. Nakhwa, Ex. B). The 2002 revision essentially pushed

back the effective date to 2004, but in all other relevant respects the regulation remained the same.

which occurred here (noting that the dangers inherent in failing to have such a device onboard are for flights "carrying a large number of passengers over a long duration sector lengths"), as explained above, the Ninth Circuit has made plain that failure to heed recommendations or suggestions made by governmental or international agencies is not enough to constitute an "event" under the Montreal Convention, *see Twardowski,* 535 F.3d at 960. Given that this "recommendation" is all that the ICAO provides with regards to AEDs, the Court holds that Air India's failure to heed the ICAO's suggestion is insufficient to constitute an "event" as understood under the Montreal Convention.

■ As far as the requirement of the Indian government cited to by the Aziz family, Air India represents that, on November 12, 2003, (after the regulation's effective date), the Indian government expressly retracted its directive for Air India to carry an AED on board its *domestic* passenger flights. The letter in question from the Director of Airworthiness for the Indian Director General of Civil Aviation begins by noting the requirements cited to by the Aziz family, and then observes that "[s]ome of the scheduled airlines had expressed reservations about installation of such equipment on the aircraft with the plea that cabin crew need to be trained for use of such equipment and there are chances that airline may be sued in the court for negligence in case of any death of passenger." (Decl. James Bentson, Ex. I). The letter also observed that, outside of the United States FAA regulations mandating AEDs onboard domestic flights, no other governmental agency had made the presence of such equipment "mandatory." In light of these concerns, the letter concluded that "this requirement [for the provision of AEDs onboard aircraft] would be deferred until the JAA makes it mandatory to European operators." *(Id).* Neither side has submitted any evidence as to whether the JAA has ever mandated that European operators of aircraft carry AEDs onboard. Thus, the Court is in no position to ignore the import from the Indian government's decision to *suspend* its requirement that an AED be placed onboard domestic flights.

On this point, all that the Aziz family argues is that they "cannot at this moment ascertain the propriety of the ... letter['s]" effect on abrogating what would otherwise be the clear mandate contained in the regulation. As expressed by their counsel, "it seems utterly impracticable that a letter from the government of India to the airline wholly owned by the government of India, can suffice as a rescission of an obligation of a law." (Opp. at 5–6). What is missing, however, is any evidence or argument (other than the personal supposition of counsel) that the letter cannot do as it proclaims—to suspend an airline regulation issued earlier by the Indian government. In the absence of such proof, and without any other evidence on the question, the Court takes the letter on its face as accomplishing what it claims to have done.

Thus, as with the ICAO's suggestion, the Court finds this failure to comply with a rescinded regulation insufficient to constitute an event under the Montreal Convention.

C. *Whether the Lack of an AED onboard the airplane was unexpected or unusual*

■ Air India further argues that, even were the Court to find that an "event" did occur, the lack of an AED onboard an international flight was not an "unexpected or unusual" occurrence. In gauging what constitutes an unusual or unexpected occurrence, the Ninth Circuit has looked to "industry standards, [the air carrier's own] policy, and the [typicality of

the] nature of . . . the requested accommodation" itself. *Husain v. Olympic Airways*, 316 F.3d 829, 837 (9th Cir.2002), *aff'd on other grounds*, 540 U.S. 644, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004). Thus, the question of industry standards vis-a-vis whether an "event" occurred bleeds into resolution of the "unexpected or unusual" occurrence question as well.

Air India asserts that conformity with its own policies and compliance with applicable laws and regulations is sufficient, foreclosing any contention that the occurrence at issue was unusual or unexpected. In essence, Air India seeks for a court to shy away from reference to industry standards in establishing whether an occurrence is unusual or unexpected. There is case law outside the Ninth Circuit to support such an approach; the Fifth Circuit in *Blansett v. Continental Airlines, Inc.*, 379 F.3d 177, 182 (5th Cir.2004), held that an airline's decision to merely cleave to the requirements of a public agency (as opposed to conforming to industry standards) was not an unusual or unexpected occurrence. Although such an approach is consistent with the analysis that failure to conform to regulatory recommendations—which are akin to industry standards—is not sufficient to constitute an "event," this Court is of the view that applying such a rationale to what is to be expected from an airline carrier goes beyond the boundaries of what the phrase "unusual or unexpected" is ordinarily understood to mean. *See Fulop*, 175 F.Supp.2d at 665 ("Any major deviation from a standard articulated in recognized practices and procedures represents the exceptional case—the unusual or unexpected happening" spoken of by the Supreme Court).

Nevertheless, the Court need not resolve this question, as the Aziz family has failed to proffer *any* evidence establishing that there was in fact an industry standard to provide such AED devices on board *international* flights. In this regard, Air India correctly observes that the Aziz family has "presented . . . no evidence that an industry standard among foreign airlines regarding onboard AEDs exist," that no evidence has been presented showing "that any governing body recommended or required AEDs," and there has been no showing that "at least one of the many other foreign or international airlines carried onboard AEDs at the time of the incident." (Def's Reply at 2). Air India not only correctly identifies what the Aziz family has failed to proffer, but also that the missing evidence would be of the type needed to establish an industry standard, *see Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914, 919 (9th Cir.2004) (observing that industry standards could be shown by international airline industry associations recommendations or by what most international airlines provide for in-flight emergency medical care). This does not mean that such evidence does not in fact exist to substantiate each of those points,[5] but the duty to provide such evidence rests with the Aziz family, and it is a burden they have not met.

5. Indeed, certain periodicals would appear to address some of the factual deficits pointed to by Air India. *See Medical Guidelines for Airline Travel, Second Edition*, AEROSPACE MEDICAL ASSOCIATION MEDICAL GUIDELINES TASK FORCE, Vol. 74, No. 5, section II (May 2003 supplement) (noting "[m]any of the world's airlines have greatly increased their capacity for providing medical care to passengers in-flight by enhancing their onboard emergency medical kits (EMKs). One of the more significant changes is the greater availability of automatic external defibrillators (AEDs)" and that "[t]he European Joint Aviation Authority already mandates similar requirements"). None of this evidence was ever offered, much less submitted, to the Court. Moreover, the Court cannot analyze the import (or lack thereof) of such information contained in a periodical.

The Aziz family seeks to reframe the point, arguing that the *domestic* requirements in both the United States and India to have AEDs onboard was instructive of a "shift" in industry standards "towards implementing AEDs," which thereby demonstrates that Air India Flight 137 taking off from Frankfurt, Germany, without such equipment onboard was unusual or unexpected. (Pls' Opp. at 7). Even assuming that *domestic* regulatory requirements could be considered in establishing an international norm, a growing shift toward something is not the same as an established standard to provide the same.

In the absence of such proof, the Court finds that there is insufficient evidence to establish that there is an industry standard upon which a showing of an "unusual or unexpected" occurrence can be made regarding the lack of an AED onboard Air India Flight 137.

Thus, in the final analysis, the Aziz family cannot show that their husband and father's death was a result of an "accident" as that term is understood under the Montreal Convention.

### III. *Conclusion*

Accordingly, the Court **DENIES** the Aziz family's motion for summary judgment and **GRANTS** Air India's motion for summary judgment, finding that Aziz's death onboard Flight 137 was neither an "event" nor an "unusual or unexpected" occurrence in light of the lack of evidence on industry standards regarding the latter, and the affirmative proof by Air India that provision of such AED devices was neither requested by Dr. Mittal nor was it re-

quired by governmental or international regulatory agencies at the relevant time for international flights.[6]

---

6.   Insofar as whether the lack of such a device "caused" Aziz's death, the Court finds that there is a disputed issue of fact (one even obliquely conceded by Air India's medical expert, Dr. Ilan Kedan (*see* Decl. Dr. Ilan Kedan ¶ 15), on the point given the paramedics finding that Aziz was systolic at the time when they first examined him and had V-fib waves

when initially hooked up to their EKG monitor. The exception taken by Air India to the lack of an autopsy does nothing to dampen the factual dispute arising from the EKG monitor's results upon the paramedics first arriving at the gate. That is sufficient to send the issue of causation to a jury.